A03A0814, A03A0815. SCHOENBAUM LIMITED COMPANY, LLC et al. v. LENOX PINES, LLC et al.; and vice versa.
(585 SE2d 643)

PHIPPS, Judge.

These cross-appeals involve the construction of an apartment complex in Atlanta. Real estate developer David Smith and his affiliated business, Lenox Pines, LLC, initiated the project and entered into agreements with Raymond Schoenbaum and his affiliated business, Schoenbaum Limited Company, LLC (SLC), to continue development. Smith alleges that Schoenbaum later forced him out of the project and entered into new agreements with Henry Hirsch and his affiliated business, Fulton-2505 Pinetree Associates, LLC (Fulton-2505). Hirsch and Schoenbaum created a new entity, Fulton-Canlen Associates, LLC (Fulton-Canlen), and completed the complex.

The record shows that in 1995 and 1996, Smith assembled 12 separately owned tracts of land near Sidney Marcus Boulevard with the intention of building a luxury apartment complex. In July 1996, he met with Schoenbaum in an effort to obtain financial backing for the project. Smith and SLC signed a written contract titled "Restatement by the Entirety of Business Resolution Agreement" (REBRA), under which SLC would buy the property and obtain funding to build the apartment complex and Smith would transfer to SLC all property rights and work product developed for the complex. Through Lenox Pines, Smith would receive ten percent of the profit generated by the completed apartment complex. The parties also entered into a Development Agreement under which Smith and Lenox Pines would assist with the "construction, development, leasing, and management" of the complex.

Pursuant to the Development Agreement, Smith hired independent contractors to perform preliminary work at the site, including clearing, grading, and blasting, while the parties searched for a general contractor. In December 1996, Schoenbaum notified Smith that he

was terminating the Development Agreement. Schoenbaum claims that this termination occurred because the site work being performed under Smith's supervision was inadequate and dangerous.

After terminating the Development Agreement, SLC entered into an agreement with Hirsch, a general contractor, and his company, Fulton-2505, to complete the project. In July 1997, Schoenbaum and Hirsch created Fulton-Canlen and transferred title to the property to it. SLC owns 75 percent of Fulton-Canlen and Fulton-2505 owns 25 percent. The apartment complex, called Canlen-Walk, was then built.

Smith and Lenox Pines (collectively, plaintiffs) filed a 20-count complaint against Schoenbaum, SLC, Hirsch, Fulton-2505, and Fulton-Canlen (collectively, defendants), and SLC counterclaimed. Both sides filed multiple motions for partial summary judgment on a variety of issues, and the trial court issued a 51-page order granting some of those motions and denying others. These appeals followed.

In Case No. A03A0814, defendants appeal the court's grant of partial summary judgment to plaintiffs on Count 3 of the complaint, which alleged that SLC owed plaintiffs a $200,000 "development fee" after they terminated the Development Agreement. Defendants also appeal the court's denial of summary judgment to them on Counts 7, 8, 9, 19, and portions of Count 20 of the complaint, which alleged breach of the REBRA, fraud, and civil Georgia Racketeer Influenced and Corrupt Organizations (RICO) Act.[1]

In Case No. A03A0815, plaintiffs appeal: (1) the court's grant of summary judgment to defendants on Counts 5 and 15 of their complaint, which alleged breach of an oral agreement and conversion of their share of Canlen-Walk's profits; (2) the court's denial of summary judgment to them on Counts 7 and 8 of their complaint, alleging breach of the REBRA, and on SLC's counterclaim and defendants' affirmative defense of laches; (3) the court's failure to award appropriate interest to them under Count 3 of their complaint; and (4) the court's denial of their motion to compel certain discovery.

We consolidate these cases on appeal.

1. (a) As an initial matter, plaintiffs argue that only one of defendants' claims of error in Case No. A03A0814 is properly before us — the trial court's grant of partial summary judgment to plaintiffs on Count 3 of their complaint. Even though a grant of partial summary judgment does not resolve all issues in a case, it is directly appealable under OCGA § 9-11-56 (h).[2] Plaintiffs contend that defendants' other claims of error, which concern the trial court's

---

[1] OCGA § 16-14-1 et seq.

[2] See *Ferguson v. United Ins. Co. of America*, 163 Ga. App. 282-283 (1) (293 SE2d 736) (1982).

denial of partial summary judgment to defendants on other counts in the complaint, are improperly "packaged" with the single appealable claim and should not be reviewed.

In *Southeast Ceramics v. Klem*,[3] our Supreme Court held that "when a direct appeal is taken, any other judgments, rulings or orders rendered in the case and which may affect the proceedings below may be raised on appeal and reviewed and determined by the appellate court."[4] This rule is designed to avoid "appellate review by installment" and "to encourage appellate determination of issues in a case in the fewest possible appellate procedures."[5] Because the "packaged" claims are sufficiently related to the directly appealable claim and "may affect the proceedings below,"[6] we will review all claims.

(b) Plaintiffs' motion for penalties for frivolous appeals, based on our alleged lack of jurisdiction to hear "packaged" claims, is denied.

2. Count 3 of the complaint alleged, in part, that the Development Agreement obligated SLC to pay Lenox Pines a $200,000 development fee upon terminating that agreement. The trial court granted partial summary judgment to Lenox Pines on Count 3 and ordered SLC to pay the fee into the registry of the court. The court also directed SLC to pay (1) prejudgment interest on that sum at the rate of seven percent "from the dates due specified in the Development Agreement section 3.1 (b), as calculated by Plaintiffs" and (2) post-judgment interest at the statutory rate of twelve percent.[7]

SLC does not dispute that it is liable for the development fee. It argues, however, that it is not responsible for paying any interest — prejudgment or post-judgment — on that fee. Lenox Pines argues that the prejudgment interest rate should have been 1.5 percent per month, rather than seven percent per year. We agree with SLC that the court erred by awarding post-judgment interest, but we find no error in the court's award of prejudgment interest at the rate of seven percent per year.

(a) Post-judgment interest accrues only after the entry of final judgment.[8] The trial court granted partial summary judgment to Lenox Pines on Count 3 of the complaint, but it did not direct the entry of final judgment on that claim pursuant to OCGA § 9-11-54 (b).[9] Because final judgment has not been entered on Count 3, we

---

[3] 246 Ga. 294 (271 SE2d 199) (1980).

[4] Id. at 295 (1).

[5] Id.

[6] See *Tronitec, Inc. v. Shealy*, 249 Ga. App. 442, 443 (1) (a) (547 SE2d 749) (2001); *Green v. Sams*, 209 Ga. App. 491, 495, n. 1 (433 SE2d 678) (1993).

[7] See OCGA § 7-4-12.

[8] See *City of Atlanta v. Wright*, 159 Ga. App. 809-810 (2) (285 SE2d 250) (1981).

[9] That Code section provides, in relevant part, that "[w]hen more than one claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to

reverse the portion of the court's order directing SLC to pay post-judgment interest into the registry of the court.[10]

(b) SLC argues that it is not liable for prejudgment interest for several reasons. First, it maintains that any interest it might owe depends on its liability for the development fee, which may be decreased or eliminated if it wins its counterclaim. But if SLC wins the counterclaim and thereby reduces or extinguishes its liability to Lenox Pines, then SLC can reclaim the development fee — and associated interest — from the court's registry.

Second, SLC claims that there was insufficient evidence regarding the amount of prejudgment interest claimed to be due and that the trial court's order was not clear about when the interest began to accrue. We find neither a lack of evidence nor one of specificity. SLC admitted that it terminated the Development Agreement without cause on December 13, 1996, and that it owed Lenox Pines $200,000 under § 3.1 (b) of that agreement. These admissions obviated the need for evidence. Moreover, the Development Agreement indicates that any outstanding fees were due upon termination, so interest logically began accruing on the termination date.

Third, SLC argues that it is entitled to the protection of OCGA § 9-11-67, which provides that

> [i]n an action in which any part of the relief sought is a judgment for a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing to be held by the clerk of the court. . . . *Where the thing deposited is money, interest thereupon shall abate.*[11]

Interest abates on money paid into the court's registry if the requirements of OCGA § 9-11-67 are satisfied.[12] Although SLC claims that it "voluntarily" paid the development fee, it did not seek "leave of court" to do so, as the statute contemplates; rather, it was *ordered* to pay the fee after Smith and Lenox Pines moved for summary judgment on the issue. Thus, OCGA § 9-11-67 does not entitle SLC to abate-

---

one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

[10] Compare *Nodvin v. West*, 197 Ga. App. 92, 94 (2) (397 SE2d 581) (1990) (post-judgment interest may accrue where court directed entry of final judgment on part of case pursuant to OCGA § 9-11-54 (b)).

[11] (Emphasis supplied.)

[12] See *Threatt v. Forsyth County*, 250 Ga. App. 838, 845 (2) (552 SE2d 123) (2001); *Gunnin v. Parker*, 198 Ga. App. 864, 866 (1) (403 SE2d 822) (1991) (no abatement where party did not obtain leave of court before depositing money into court's registry).

ment of prejudgment interest on the development fee.[13] We affirm the portion of the trial court's order directing SLC to pay prejudgment interest into the court's registry.

(c) Lenox Pines argues that the applicable rate of prejudgment interest is 1.5 percent per month — or 18 percent per year — as provided in OCGA § 7-4-16 for commercial accounts. But Count 3 of the complaint alleged breach of a contract (the REBRA), not a delinquent commercial account. OCGA § 7-4-16 applies "only to obligations to pay for goods and services on a commercial account and is inapplicable to obligations to return money arising out of the termination of a business relationship."[14]

3. Count 5 of the complaint alleged that Schoenbaum and SLC breached an oral agreement to pay Smith for using his best efforts to enable SLC to purchase certain property needed to complete Phase II of the project. According to plaintiffs, this oral agreement — made approximately one month before the REBRA — obligated SLC to pay Smith the difference between $3,950,000 and the actual purchase price of the Phase II property. Plaintiffs assert that SLC bought the property for $3,550,000 due to their efforts, and that SLC therefore owes Smith $550,000.[15]

Defendants sought summary judgment on this claim, arguing that the REBRA did not provide for such a payment and that the parol evidence rule barred evidence of any alleged oral agreement that contradicted the REBRA. The trial court granted defendants' motion, and Smith appeals.

Although the REBRA did not contain a merger clause, "[p]arol contemporaneous evidence is generally inadmissible to contradict or vary the terms of a valid written instrument."[16] Thus, the issue is whether the alleged oral agreement contradicted or varied the terms of the REBRA.

Paragraph 6 (c) of the REBRA comprehensively addressed the parties' obligations with respect to the Phase II property. Among other things, that paragraph required Smith and Lenox Pines to (1) execute and deliver to Schoenbaum a promissory note, personal guarantee, and pledge agreement; and (2) use their best efforts to acquire

---

[13] Compare *Sacha v. Coffee Butler Svc.*, 215 Ga. App. 280, 281 (1) (450 SE2d 704) (1994) (abatement allowed where deposits into registry were "authorized by court order and agreed upon by the parties").

[14] *Hayden v. Sigari*, 220 Ga. App. 6, 11 (8) (467 SE2d 590) (1996); compare *Wheat Enterprises v. Redi-Floors*, 231 Ga. App. 853, 855-856 (1) (b) (501 SE2d 30) (1998) (OCGA § 7-4-16 applicable where work involved was "beyond [the] contract" and there was history of "invoice-based and not contract-based" billing).

[15] The difference between $3,950,000 and $3,550,000 is $400,000. Plaintiffs do not explain the discrepancy between that figure and the $550,000 they seek in Count 5.

[16] OCGA § 24-6-1; see also *Ansley v. Forest Svcs.*, 135 Ga. App. 745, 747 (1) (218 SE2d 914) (1975).

the Phase II property for Schoenbaum's sole benefit. The paragraph also provided that if Smith delivered certain documents to Schoenbaum that enabled him to obtain the Phase II property by a certain date

> for a purchase price not exceeding [$3,950,000], then Schoenbaum shall be required to acquire [the property] and, at the closing of such acquisition, cancel the Note, the Guaranty, and the Pledge Agreement and pay to Lenox Pines an amount equal to $70,000 (plus interest . . . ), which sum, excluding the interest, shall be credited against any fees due under the Development Agreement.

Thus, the REBRA obligated Schoenbaum to pay Lenox Pines $70,000 if plaintiffs enabled SLC to purchase the property for $3,950,000 or less. The alleged oral agreement, which established a different fee arrangement, contradicted the REBRA. Accordingly, evidence of the oral agreement was not admissible and the trial court properly granted summary judgment to defendants on Count 5 of the complaint.

4. Count 7 of the complaint alleged that SLC breached a nonassignment clause contained in Paragraph 7 (b) of the REBRA by conveying the project's property to Fulton-Canlen, including all rights and interests in the property and in any "work product" created to further the development. An amendment to the complaint alleged that defendants also breached Paragraph 7 (b) by obtaining a construction loan, followed by permanent financing, for the project. The parties filed cross-motions for summary judgment on Count 7; the trial court denied both motions; and both sides appeal.

Paragraph 7 (b) of the REBRA provided:

> Neither any Smith party nor Schoenbaum shall assign, transfer or encumber any right, obligation or interest *under this Agreement.* Any attempted assignment, transfer or encumbrance shall be null and void. Subject to the foregoing provisions of this subparagraph, this Agreement shall inure to the benefit of and bind the parties hereto and their respective successors and assigns.[17]

The trial court ruled that this paragraph "places restriction on assignment, transference, or encumbrance of any obligation imposed by or any right or interest created, arising, or acquired through the language of the [REBRA]." The court further ruled that summary

---

[17] (Emphasis supplied.)

judgment was not appropriate because factual disputes existed as to (1) what rights and interests plaintiffs held in the property; (2) which of these rights and interests were transferred to Fulton-Canlen; (3) whether the REBRA was inherently nonassignable because it required the performance of personal services by SLC or "involve[d] a relation of personal confidence between the parties";[18] (4) whether the "loss of predictability stemming from the fact that Smith might sustain material loss from a transfer or assignment constitutes such a sufficient burden" as to warrant enforcement of the nonassignment clause; and (5) whether any of defendants' asserted defenses to the alleged breach of the nonassignment clause were valid.

Plaintiffs argue that although the court correctly interpreted Paragraph 7 (b), it nevertheless should have granted summary judgment in their favor because it is undisputed that, under the REBRA, plaintiffs transferred "some" plans and project documents to SLC, which then transferred them to Fulton-Canlen, which then pledged them as security to obtain financing for the project. Plaintiffs assert that the transfer to Fulton-Canlen plainly violated Paragraph 7 (b). We agree with the trial court's interpretation of Paragraph 7 (b) and agree that the factual disputes highlighted by the court foreclose any grant of summary judgment on this issue to plaintiffs. Thus, we affirm the court's denial of plaintiffs' motion for summary judgment on Count 7.

Defendants argue that the court construed Paragraph 7 (b) too broadly. In their view, it merely restricted the transfer or encumbrance of the REBRA itself and any executory rights or obligations remaining under the REBRA; it "[did] not restrict SLC's right to assign or encumber every asset allegedly acquired under the REBRA, including the Property, after the consummation of the transaction." According to defendants, at the time SLC transferred the property and associated work product to Fulton-Canlen, plaintiffs' only remaining interest under the REBRA was their right to receive ten percent of the Canlen-Walk profits. Because SLC has never transferred its obligation to pay that profit participation interest, defendants urge, no violation of Paragraph 7 (b) has occurred.

We reject defendants' cramped construction of Paragraph 7 (b). The prohibition in that paragraph cannot be limited to the REBRA itself; otherwise the clause would simply state that *the REBRA* cannot be assigned, transferred, or encumbered, without referring to "any right, obligation or interest under this Agreement." Nor are we persuaded that Paragraph 7 (b) did not apply to transfers or encumbrances of the property and associated work product. Although, as

---

[18] See *Gold Kist v. Wilson*, 227 Ga. App. 848, 852 (2) (490 SE2d 466) (1997).

defendants point out, other portions of the REBRA appeared to contemplate the possibility of future debt service on the property, those portions did not amount to a consent to encumbrance by plaintiffs.[19]

Finally, we do not agree that Paragraph 7 (b)'s prohibition applied only to executory rights and obligations under the REBRA. Defendants cite *Mingledorff's, Inc. v. Hicks*[20] for the proposition that nonassignment clauses apply only to portions of a contract that have not yet been performed. In *Mingledorff's*, we enforced a nonassignment clause in a contract that was "clearly an executory one with mutual obligations between the parties."[21] But we did *not* hold that, in determining whether a nonassignment clause is enforceable, courts should parse the contract, differentiate executory rights and obligations from those already performed, and permit assignment only of the latter.

Even if we accepted defendants' argument that nonassignment clauses generally do not apply to obligations that have already been performed, our Supreme Court's recent decision in *Singer Asset Finance Co. v. CGU Life Ins. Co. of America*[22] established a rule that could prohibit the assignment here. In *Singer*, CGU Life Insurance entered into a structured settlement agreement requiring it to make periodic payments to the Revill brothers, who later assigned their right to receive the payments to Singer. CGU sued the brothers and Singer, claiming that the assignment violated a provision of the settlement agreement prohibiting the sale or encumbrance of future payments. The court agreed with CGU. Even though the Revill brothers had no remaining obligations under the contract, they could not assign their right to future payments because a nonassignment clause should be enforced "when that clause was inserted to protect a party from a material reduction in the value of the contract."[23]

Applying *Singer* here, Paragraph 7 (b) prohibited SLC's transfer or encumbrance of any rights or interests under the REBRA — whether executory or not — if that transfer or encumbrance would materially reduce the value of the REBRA to plaintiffs. Plaintiffs argue that the transfer of the property and work product to Fulton-Canlen, and Fulton-Canlen's subsequent encumbrance of those items to obtain financing, materially reduced the value of their ten percent profit participation interest due to the risk of loan default. Moreover, plaintiffs point to Smith's deposition testimony that Paragraph 7 (b)'s restrictions were heavily negotiated and inserted specifically to pro-

---

[19] See id.
[20] 133 Ga. App. 27 (209 SE2d 661) (1974).
[21] Id. at 27 (1).
[22] 275 Ga. 328 (567 SE2d 9) (2002).
[23] Id. at 329 (1).

tect plaintiffs' profit participation interest. Defendants counter that the procurement of outside financing actually enhanced plaintiffs' profit participation interest. This is a factual dispute not amenable to summary judgment. Accordingly, we affirm the trial court's denial of summary judgment to defendants on Count 7 of the complaint.

5. (a) Counts 8 and 9 of the complaint alleged that Schoenbaum and SLC breached Smith's right of first refusal to purchase the project, contained in Paragraph 5 (f) of the REBRA, when they transferred the project property to Fulton-Canlen and engaged a new general contractor to build the complex without notice to Smith. Count 8 sought specific performance of Paragraph 5 (f), and Count 9 sought damages and a judgment lien on the property. Defendants moved for summary judgment on both counts, arguing that Smith's right of first refusal was never triggered. Plaintiffs sought summary judgment on Count 8. The trial court denied both motions.

Paragraph 5 (f) of the REBRA provided, in relevant part: "If Schoenbaum elects not to develop the Project, Schoenbaum agrees not to sell, assign or otherwise transfer the Project or any portion thereof . . . to any third party . . . without first giving written notice . . . to Smith." Smith, then, had the opportunity to purchase the Project. Thus, under Paragraph 5 (f), Smith's right of first refusal was triggered if Schoenbaum "elects not to develop the property."

The parties disagree over the meaning of "develop," a term not defined in the REBRA. According to defendants, "develop" means "to proceed with the development of the project as its principal owner." Because SLC remained the principal owner of the project after the transfer to Fulton-Canlen, defendants contend, SLC never "elect[ed] not to develop the property" and the triggering event never occurred. Plaintiffs, on the other hand, define "develop" more narrowly, to require direct involvement and the use of personal skills in the construction of the complex. In plaintiffs' view, even though SLC retained principal ownership of the project, it did not "develop" it; instead, it "ced[ed] all developmental rights and control to the Project" to the new entity, Fulton-Canlen.

The trial court found that "develop" was ambiguous because either defendants' or plaintiffs' interpretation could be correct. Thus, the court applied rules of contract construction to determine the meaning of the word,[24] looking to other parts of the REBRA and to the Development Agreement, which is referenced in the REBRA, to ascertain the parties' intent. After a detailed examination of the use of the words "develop," "development," and "developer" in those docu-

---

[24] See *Deep Six v. Abernathy*, 246 Ga. App. 71, 73 (2) (538 SE2d 886) (2000) (trial court must first decide whether contract language is ambiguous; if it is ambiguous, court must then apply applicable rules of construction); OCGA § 13-2-2.

ments, the court concluded that "the parties' intentions as to what functions comprise the verb 'develop' are ambiguous."

After examining the REBRA and the Development Agreement, we agree with the trial court. The jury must resolve this remaining ambiguity and determine what the parties intended would trigger Smith's right of first refusal. Neither plaintiffs nor defendants were entitled to summary judgment on Counts 8 and 9 of the complaint. We therefore affirm the trial court's rulings on the partial summary judgment motions concerning those counts.

(b) Plaintiffs claim that the trial court erred by ordering discovery of Smith's financial ability to exercise the right of first refusal in Paragraph 5 (f). Plaintiffs argue that Smith's financial condition was not relevant because defendants would have rejected any tender of money by him to purchase the project.

We affirm a trial court's discovery rulings unless the court clearly abused its discretion.[25] If Smith lacked the financial means to exercise his right of first refusal, then, as defendants point out, any breach of that right caused him no harm and no damages. Therefore, discovery about his financial condition was relevant.

*Phoenix Tower v. Shaffer*,[26] cited by plaintiffs, does not apply here. That case held that a plaintiff seeking specific performance of a right of first refusal was excused from the requirement of tendering the purchase price because he showed that the defendant would not have accepted his tender. But the issue here is not whether Smith was required to make a tender when defendants allegedly breached his right of first refusal in the REBRA; the issue is whether Smith can now afford to exercise that right. Because his financial condition is relevant to that issue, the trial court did not clearly abuse its discretion by ordering such discovery.

6. Count 15 of the complaint alleges that defendants committed civil conversion by conspiring to divert plaintiffs' ten percent profit participation interest. The trial court granted summary judgment to defendants on this claim, ruling that "[m]ere failure to pay money under a contract is not a proper subject for conversion." Plaintiffs appeal, citing *Unified Svcs. v. Home Ins. Co.*[27]

In *Unified Svcs.*, Home Insurance Company entered into a contract with insurance broker Unified Services under which Home provided insurance for Unified's client and Unified billed the client and remitted the premiums, plus a commission, to Home. Home sued Unified for conversion because it stopped remitting the premiums,

---

[25] *Yang v. Washington*, 256 Ga. App. 239, 244 (3) (568 SE2d 140) (2002).
[26] 254 Ga. App. 394 (562 SE2d 788) (2002).
[27] 218 Ga. App. 85, 87-89 (4) (460 SE2d 545) (1995).

even though the client was still paying them. We held that Home stated a valid claim for conversion.

> While a tort action cannot be based on the breach of a contractual duty only, it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law. . . . In failing to remit premium payments for the client to [Home], [Unified] not only breached [its] duties under the contract, but also breached statutory *and fiduciary duties* imposed by law.[28]

Defendants argue that *Unified Svcs.* does not apply here because this case does not involve "the breach of duties imposed on insurance brokers under Georgia law." But this case might involve the breach of fiduciary duties. Counts 6, 16, and 17 of the complaint alleged that defendants breached fiduciary duties owed to plaintiffs. Defendants sought summary judgment on those counts, but the trial court denied their motion, finding that "[i]t is a question of fact whether the relationship resulting from the REBRA entered into by the parties is a confidential relationship." Defendants have not appealed that ruling. Because plaintiffs' conversion claim may rest not only on breach of contract, but also on breach of fiduciary duty, the trial court should not have granted summary judgment to defendants on the conversion claim. We reverse that ruling.

7. Count 19 of the complaint alleged that defendants committed fraud by, among other things, making promises to plaintiffs with no present intent to perform them. Defendants sought summary judgment on this claim, but the trial court denied their motion. They argue that the court erred because "the record is devoid of any evidence establishing a present intent not to perform such promises on the part of Schoenbaum."

A fraud claim cannot be based on a promise to perform an act in the future unless the promise was made with a present intent not to perform.[29] In denying defendants' motion for summary judgment, the trial court referred to "relevant deposition testimony taken August 26, 1997 that raises a question of fact about [Schoenbaum's] intent." Although the court did not provide a citation, plaintiffs assert that it was referring to an excerpt from a transcript of Schoenbaum's August 26, 1997 deposition, which was attached to a reply brief filed by the plaintiffs. Defendants, however, argue that the court was not authorized to consider that deposition transcript because it was not

---

[28] (Citation omitted; emphasis supplied.) Id. at 87 (4) (a).
[29] *Buckley v. Turner Heritage Homes*, 248 Ga. App. 793, 795 (3) (547 SE2d 373) (2001).

filed with the court in accordance with OCGA § 9-11-5 (e).[30] As plaintiffs have failed to show that the deposition in question was properly before the court, we agree with defendants that the court's apparent reliance on that deposition was unauthorized.[31]

But we cannot agree, at this juncture, that defendants were entitled to summary judgment on the fraud claim. In the same order denying summary judgment, the trial court reserved judgment on plaintiffs' motion to use two depositions that, according to plaintiffs, also would have supported their fraud claim. Because the court might admit those depositions, and the depositions might create an issue of fact on the fraud claim, summary judgment is not appropriate now.[32]

8. Count 20 of the complaint alleged that defendants violated Georgia's RICO law by conspiring to acquire and maintain an interest in the apartment complex for pecuniary gain. It alleged that defendants committed nine predicate criminal acts. The trial court granted summary judgment to defendants on two of those alleged acts, but denied summary judgment on these seven: (1) theft by deception, when SLC entered into the REBRA with the intent to gain control of Smith's property;[33] (2) theft by deception and making false statements, when SLC filed a false Georgia transfer tax declaration;[34] (3) making false statements, when Schoenbaum and Hirsch falsely asserted that the property was free of all claims in an effort to obtain a bank loan;[35] (4) making false statements, when Schoenbaum and Hirsch executed a guaranty in favor of a bank denying the existence of any pending legal proceedings related to the property;[36] (5) theft by conversion, in wrongly retaining Lenox Pines's distribution of profits;[37] (6) theft by conversion, in wrongly obtaining Lenox Pines's share of funds from financing the project;[38] and (7) tampering with a witness by paying or offering to pay Cynthia Lucas, a former

---

[30] OCGA § 9-11-56 (c).

[31] See *Buchanan v. City of Clayton*, 180 Ga. App. 740, 741 (350 SE2d 320) (1986) (reversing grant of summary judgment based on evidence not properly before trial court).

[32] In support of their position that Schoenbaum had no present intent to perform, plaintiffs also point to a transcript of a telephone conversation that allegedly took place between Schoenbaum and two attorneys before the REBRA was executed. During that conversation, Schoenbaum allegedly said, "There's got to be a way to get [Smith] out of everything. . . ." Defendants argue that the transcript of the alleged conversation is not admissible. The trial court apparently did not resolve that issue. In light of our conclusion that defendants are not entitled to summary judgment on the fraud claim, we need not address the admissibility of the transcript.

[33] See OCGA §§ 16-14-3 (9) (A) (ix); 16-8-3.

[34] See OCGA §§ 16-14-3 (9) (A) (ix), (xv); 16-8-3; 16-10-20.

[35] See OCGA §§ 16-14-3 (9) (A) (xv); 16-10-20.

[36] See id.

[37] See OCGA §§ 16-14-3 (9) (A) (ix); 16-8-4.

[38] See id.

employee of Smith, for false testimony.[39] Defendants appeal, giving several reasons why the RICO claim must fail.

(a) Defendants argue that there was no evidence of witness tampering. Under OCGA § 16-10-93 (a), the crime of influencing a witness occurs when "[a] person who, with intent to deter a witness from testifying freely, fully, and truthfully to any matter pending in any court, . . . offers or delivers any benefit, reward, or consideration to such witness. . . ."

Plaintiffs' evidence of witness tampering consisted of an interrogatory response by defendants stating that Lucas approached them offering to be a "character witness" and that they discussed with her "[t]he prospect of providing for temporary accommodations for her and her children if she was dispossessed to enable her to attend [a] hearing." Plaintiffs also point to an e-mail exchange between defense counsel and Lucas, who apparently was planning to move to a different state. In the first e-mail, Lucas asked, "Wouldn't it be illegal to put me up in a hotel for a couple of weeks?" Defense counsel's reply e-mail stated:

> I believe we could justify it on humanitarian grounds and for our own convenience in having you available for the hearing, etc. If we have to come to Greenville to depose you that will cost money. I am not talking about the Ritz. I do not believe a judge or jury would find fault with our doing that, since you have already shown a willingness to help us, and have given us an affidavit. We don't want you to do anything other than what you were planning to do already. We just don't want to have to come to Greenville to get your testimony and we would like you to be in town for the Sept. 5th hearing. If you think it is best for you to go ahead and go to Greenville to get your child enrolled in school there, and you are willing to come back for the hearing, we can legally pay you for your time away from work, a babysitter, and transportation. If you come the night before, we can put you up at a hotel, and pay for your meals. If you decide to go to Greenville, please let us know how to contact you once you are there.

The trial court found that questions of fact remained as to whether defendants' offers to assist Lucas "show an illicit intent" to deter her from testifying freely, fully, and truthfully. We disagree.

Although the evidence showed that defendants offered to pay expenses incurred by Lucas in attending a hearing, it did not show

---

[39] See OCGA §§ 16-14-3 (9) (A) (xiv); 16-10-93.

any intent to influence her testimony. To the contrary, the e-mail message by defense counsel explicitly stated, "We don't want you to do anything other than what you were planning to do already." Moreover, defense counsel's offers of assistance were explicitly permissible under the State Bar of Georgia Rules of Professional Conduct.[40]

Plaintiffs' brief on appeal refers to other evidence that purportedly shows defendants' intent to influence Lucas's testimony. But the trial court denied plaintiffs' motion to supplement the record with this evidence on the ground that it was untimely, and plaintiffs have not appealed that ruling. Accordingly, we do not consider that evidence.

Because the record before us is bereft of any admissible evidence of witness tampering, we reverse the trial court's denial of summary judgment to defendants on that predicate act.

(b) Defendants contend that the alleged predicate act of conversion fails as a matter of law because a breach of contract cannot amount to a criminal conversion under OCGA § 16-8-4.[41] The trial court rejected this argument, citing *Tukes v. State*.[42] There, we held that while OCGA § 16-8-4 is not intended to punish a simple breach of contract, "[t]he presence of fraudulent intent . . . distinguishes theft by conversion from breach of contract."[43] The court correctly ruled that whether defendants acted with fraudulent intent is a jury question. Thus, we affirm the court's denial of defendants' motion for summary judgment on this predicate act.

(c) Defendants argue that plaintiffs lack standing to bring a RICO claim because they were not directly injured by the alleged predicate acts. A private RICO plaintiff "must show a direct nexus between at least one of the predicate acts listed under the RICO Act and the injury [it] purportedly sustained."[44] To establish this nexus, the plaintiff must show that one of the predicate acts directly harmed *it*, not a third party.[45]

---

[40] See Rule 3.4 (b) (3) (i) and (ii), which allow payment of "expenses reasonably incurred by a witness in preparation, attending or testifying" and "reasonable compensation to a witness for the loss of time in preparing, attending or testifying."

[41] OCGA § 16-8-4 (a) provides, in relevant part, that
[a] person commits the offense of theft by conversion when, having lawfully obtained funds or other property of another . . . under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation.

[42] 250 Ga. App. 117 (550 SE2d 678) (2001).

[43] (Footnote omitted.) Id. at 118 (1) (a).

[44] (Footnote omitted.) *Nicholson v. Windham*, 257 Ga. App. 429, 430 (1) (571 SE2d 466) (2002).

[45] See id.; *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 805-806 (1) (500 SE2d 591) (1998).

We agree with defendants that plaintiffs failed to establish any direct injury from the alleged predicate acts of filing a false transfer tax declaration and making false representations to lenders. As defendants point out, these alleged acts were directed at, respectively, the State of Georgia and a bank. Plaintiffs argue that these actions injured them, as well, but any injury to plaintiffs was indirect and therefore insufficient to create standing for a RICO claim.[46]

We do not agree with defendants, however, that undisputed evidence shows that plaintiffs suffered no direct injury from the alleged theft by deception and conversion stemming from breaches of the REBRA. Defendants contend that these alleged acts did not injure plaintiffs because their only remaining right under the REBRA was the ten percent profit participation interest, which SLC is honoring. But SLC apparently ignored that interest until after litigation began. Moreover, as discussed infra, questions of fact remain as to the scope of plaintiffs' other rights under the REBRA, including the right of first refusal in Paragraph 5 (f) and the nonassignment clause in Paragraph 7 (b). Those fact disputes preclude a ruling that plaintiffs were not directly injured by defendants' alleged criminal acts based on violations of the REBRA.

Thus, while defendants were entitled to summary judgment on the predicate act of witness tampering, they were not entitled to summary judgment on the remainder of plaintiffs' RICO claim.

9. (a) Plaintiffs claim that the trial court erred by denying their motion for partial summary judgment on SLC's counterclaim for negligent construction in violation of the Development Agreement. The court ruled that there were issues of material fact as to whether plaintiffs acted negligently in their supervision and utilization of contractors working at the project site. After examining the record, we agree.

Plaintiffs argue that the collateral source rule bars any recovery by SLC. According to plaintiffs, SLC did not suffer any loss due to their alleged negligence because it transferred the property to Fulton-Canlen before expenditures were made to correct problems at the site. But the collateral source rule prevents a tortfeasor from enjoying the benefit of collateral sources (such as insurance payments) that might have paid for damage it did.[47] The rule does not bar recovery by a claimant — here, SLC. In addition, as the trial court pointed out, there are questions of fact about whether SLC's alleged expenses were incurred before or after the transfer for Fulton-Canlen.

---

[46] See *Nicholson,* supra; *Maddox,* supra.
[47] See *Olariu v. Marrero,* 248 Ga. App. 824, 825 (549 SE2d 121) (2001).

Plaintiffs also argue that the undisputed evidence shows that they did not perform any of the construction work themselves and that there was no negligence. But the Development Agreement, on which the counterclaim is based, obligated Smith to "[s]upervise the construction and development of the project." And defendants presented evidence that Smith held himself out as a skilled developer. Thus, in carrying out their obligations under the Development Agreement, Smith and his affiliated company were required to use reasonable skill and care.[48] Because SLC presented evidence that the construction supervised by Smith was not undertaken with reasonable care, plaintiffs were not entitled to summary judgment on the counterclaim.

(b) Plaintiffs also claim that the trial court erred by failing to award them summary judgment on SLC's counterclaim for punitive damages flowing from its negligent construction claim. Plaintiffs argue that punitive damages are not available on claims of simple, or even gross, negligence.

Under OCGA § 51-12-5.1 (b), punitive damages may be awarded in tort actions where clear and convincing evidence shows that the tortfeasor acted with "[an] entire want of care which would raise the presumption of conscious indifference to consequences." In support of its claim for punitive damages, SLC points to deposition testimony from an engineer that the work performed under plaintiffs' supervision was "foolish," "a clear violation of the OSHA standard," and "could kill somebody." This evidence of "circumstances of aggravation or outrage"[49] was sufficient to defeat plaintiffs' motion for summary judgment on punitive damages.

10. Plaintiffs argue that the trial court erred in denying their motion for summary judgment on defendants' affirmative defense of laches, raised in response to Count 8 of the complaint, which sought specific performance of plaintiffs' right of first refusal. According to defendants, Count 8 was barred by laches because plaintiffs waited over two years after learning of the transfer of the property to Fulton-Canlen to attempt to enforce the right of first refusal.

Plaintiffs assert that, as a matter of law, defendants may not raise the defense of laches because they have "unclean hands." But the principle that "[h]e who would have equity must do equity"[50] applies, as defendants point out, "as a defense to the party seeking equitable relief, not to the party resisting it." Even if the doctrine of

---

[48] See *Hudgins v. Bacon*, 171 Ga. App. 856, 859 (1) (321 SE2d 359) (1984).

[49] (Citation and punctuation omitted.) *Windermere, Ltd. v. Bettes*, 211 Ga. App. 177, 178 (1) (438 SE2d 406) (1993) (landlord's failure to comply with mandatory safety provisions of applicable fire or building exit code could support award of punitive damages).

[50] OCGA § 23-1-10.

unclean hands could bar defendants' assertion of laches, whether defendants have acted inequitably is a question of fact not amenable to summary judgment. We affirm the trial court's denial of summary judgment on laches.

11. Finally, plaintiffs claim that the trial court erred by denying their motion to compel. That motion was based on "Plaintiffs' Notice to Produce to Defendants," which asked defendants, "[p]ursuant to O.C.G.A. Section 24-10-26," to produce certain documents related to witness Lucas "at any deposition, trial or hearing in the above case." After defendants apparently failed to produce the requested documents, plaintiffs moved to compel "pursuant to O.C.G.A. § 9-11-37." The trial court denied the motion to compel, ruling that it was not the proper vehicle to enforce a notice to produce. Finding no clear abuse of discretion, we affirm that denial.[51]

*Judgment affirmed in part and reversed in part in Case No. A03A0814. Judgment affirmed in part and reversed in part in Case No. A03A0815. Blackburn, P. J., and Ellington, J., concur.*

DECIDED JUNE 25, 2003 —
RECONSIDERATION DENIED JULY 21, 2003.

*King & Croft, F. Carlton King, Jr., Thomas A. Croft, Alston & Bird, Peter M. Degnan, David M. Meezan,* for appellants.

*Dupree, Poole & King, Hylton B. Dupree, Jr., William W. Dreyfoos, Mark A. Johnson,* for appellees.

---

[51] See *Joel v. Duet Holdings,* 181 Ga. App. 705, 706 (353 SE2d 548) (1987).