## A07A0924. ROLAND v. FORD MOTOR COMPANY, INC.
### (655 SE2d 259)

ADAMS, Judge.

Michael Roland appeals from the trial court's denial of his motion for class certification in an action he filed against Ford Motor Company, Inc. alleging claims for breach of contract, breach of warranty, and injunctive relief in connection with his purchase of a Model Year 2001 F-150 truck.

During the relevant time period, Ford offered two levels of engine cooling performance on its F-150 trucks: "a base performance and a customer purchased upgrade to Super-Duty, for trailer towing and heavy duty operation." In addition, Ford marketed and charged customers separately for the purchase of a Heavy Duty Electrical/Cooling Group option or a Class III Trailer Towing Package option. Under internal guidelines, these optional packages were required to meet Ford's Super-Duty Engine Cooling requirement, which included an upgraded radiator that was larger than the base radiator installed on Ford's standard F-150s. But internal Ford documents indicate that for a period of time affecting Model Years 2000 and 2001, Ford mistakenly installed the base radiator on its F-150 trucks equipped with the towing and cooling options, unless the customer also purchased a payload upgrade package. Despite this, the internal marketing materials continued to reflect that the cooling and towing packages included an "upgraded radiator."

Ford asserts that it learned of an issue with the radiator specifications on these trucks in the fall of 2000. The company then initiated testing to determine if the standard radiators installed on the trucks met its requirements for Super-Duty Engine Cooling. Ford tested the radiators under simulated extreme driving and towing conditions designed to maximize the demand on the cooling system. Ford concluded from this testing that the trucks equipped with the standard radiator met and exceeded Ford's Super-Duty Engine Cooling specifications, and that using the upgraded radiator would not improve the overall "functional performance, payload or towing capacity" of the F-150 trucks. As a result, Ford concluded "that there was no engineering justification or benefit to the customer to place a radiator with more cooling capacity" in the 2000 and 2001 F-150

trucks sold with the standard radiator. Subsequently, on May 5, 2001, Ford corrected its internal marketing materials to reflect this change in radiator specifications.

Ford began to receive reports, however, that a small percentage of customers were concerned about these specifications. In attempting to address the concerns, Ford surveyed customers who had purchased the optional packages but received the base radiator. The survey revealed that the customers had different levels of knowledge and concern about the radiator size, with most customers being unaware of the issue. Moreover, the customers had different preferences about what steps Ford could take to satisfy those concerns. In the summer of 2001, Ford initiated a customer satisfaction program that allowed customers who purchased the vehicle before the change in marketing materials on May 5, 2001, to choose one of three options: $100 cash; a $500 coupon toward the purchase of a new Ford vehicle; or a free replacement radiator.

Roland purchased a Lariat Series, super crew cab F-150 from the Ford dealership in Warner Robins on May 28, 2001, after the change in the internal marketing materials. He did no prior research on F-150s and read none of Ford's marketing materials on the truck, but decided that he wanted to purchase the super crew cab truck because he was looking for a four-door truck with seating capacity and a bed in which to haul things. None of the truck's other components, including the radiator, was a factor in his decision to buy an F-150. Roland's truck included the Class III Towing Group package. He talked only with one sales representative at the Ford dealership regarding his purchase and had no discussions regarding the components of the towing package or the size of the radiator. Further, he read no marketing literature from the dealership about the F-150's towing package or radiator prior to making his purchase. Accordingly, before he purchased the truck he heard no representations that the optional towing package included an upgraded radiator.

Roland recalled that the window sticker on his truck indicated that the charge for the towing package was $400, but he does not have a copy of the window sticker and could not recall whether it referenced the radiator size.[1] The bill of sale for his purchase shows that the Class III towing option had a Manufacturer's Suggested Retail Price (MSRP) of $350 and an invoice amount of $298. Neither the bill of sale nor the purchase agreement references the size of the radiator.

---

[1] Roland notes that window stickers produced by Ford indicate that customers were charged $350 to $400 for the purchase of a "Trailer Towing Group Class" as optional equipment. We note that those documents do not reference the radiator's size.

In his motion, Roland sought to certify a class consisting of "persons who purchased in the State of Georgia[2] Model Year 2000 and 2001 F-150 trucks sold with a Class III Trailer Tow Option or a Heavy Duty Electrical/Cooling Group Option."[3] A trial court has broad discretion in determining whether to certify a class action, and this Court reviews the trial court's grant or denial of class certification for abuse of discretion. See *UNUM Life Ins. Co. of America v. Crutchfield*, 256 Ga. App. 582 (568 SE2d 767) (2002). Roland bears the burden of establishing his entitlement to class certification by showing each of the factors set out in OCGA § 9-11-23. Id. Accordingly, in order to certify a class action,

the trial court must find that the members of the class are so numerous that it is impracticable to bring them all before the court; that the questions of fact and law common to the class members predominate over any individual questions; that the named plaintiff's claims are typical of those of the class members; that the named plaintiff and counsel will adequately represent the interests of the class; and that a class action better serves the interests of achieving a fair and efficient adjudication of the controversy.

(Citation omitted.) *Life Ins. Co. of Ga. v. Meeks*, 274 Ga. App. 212, 215 (617 SE2d 179) (2005).

The trial court denied certification on the ground that Roland had not met his burden of showing the requisite commonality or predominance. The trial court found that "class membership cannot be readily ascertained without individual merits determinations on all of the claims raised by the Plaintiff in his complaint." The trial court also found that Roland's claims were not typical of the class, because he did not buy the truck with the expectation that he would receive extra cooling capacity and he waited too long to initiate his breach of warranty claims.

1. Roland asserts that the trial court's order must be vacated and remanded because it did not include findings of fact and conclusions of law addressing each of the OCGA § 9-11-23 (Rule 23) factors as

---

[2] Ford sold over 20,000 Model Year 2000 and 2001 F-150s equipped with either the heavy-duty cooling package or the Class III towing package in the State of Georgia.

[3] The Complaint defined the proposed class somewhat differently:

All persons who purchased or leased in Georgia new model year 2000-2001 F-150 vehicles manufactured and/or sold by Ford Motor Company, which F-150 vehicles included either the Class III Towing Group or the Heavy-Duty Electrical Cooling Group and were manufactured and/or sold with the stock or base radiator rather than the larger upgraded radiator as was represented to be included in the Class III Towing Group and Heavy-Duty Electrical/Cooling.

required by subsection (f) (3) of the rule. That section requires that a trial court deciding an issue of class certification

> shall enter a written order addressing whether the factors required by this Code section for certification of a class have been met and specifying the findings of fact and conclusions of law on which the court has based its decision with regard to whether each such factor has been established.

OCGA § 9-11-23 (f) (3).

Roland asserts that remand is mandated under *Griffin Indus. v. Green*, 280 Ga. App. 858 (635 SE2d 231) (2006), because the trial court's order failed to address inter alia, numerosity, adequacy of representation, and superiority of class adjudication. In *Griffin Indus.*, the trial court granted the plaintiff's motion for class certification, but the court's order did not contain findings of fact or conclusions of law, nor did it address each of the factors it relied upon in certifying the class. The only analysis of the Rule 23 factors was a one-sentence statement that the plaintiff had met three of the requirements. Id. at 859 (1). This Court vacated the order and remanded the case to the trial court for a more detailed order with findings of fact and conclusions of law. Id. at 860 (1). See also *Gay v. B. H. Transfer Co.*, 287 Ga. App. 610 (652 SE2d 200) (2007) (physical precedent only) (after reversing order denying class certification to the extent trial court applied wrong standard in analyzing Rule 23 factors, this Court vacated portion of order for more detailed findings of fact and conclusions of law on superiority and adequacy of representation); *McDonald Oil Co. v. Cianocchi*, 285 Ga. App. 829 (648 SE2d 154) (2007) (vacating order certifying class where trial court did not hold hearing and certification order did not address any of the factors).

While the better practice certainly would have been for the trial court to address each factor and to set out separate findings of fact and conclusions of law, we do not believe that vacatur is warranted in this case. Even though the trial court did not address each of the Rule 23 factors, the trial court's order references the factors it relied upon in denying class certification, giving a brief discussion of the facts and law it relied upon in arriving at its conclusions. A trial court may deny class certification where a plaintiff fails to establish even one of the required Rule 23 factors. See *Carnett's, Inc. v. Hammond*, 279 Ga. 125 (610 SE2d 529) (2005); *Duffy v. Landings Assn.*, 254 Ga. App. 506, 509 (1) (563 SE2d 174) (2002). We cannot say, therefore, that the order provides "no basis to evaluate whether the trial court properly exercised its discretion" in deciding the issue of class certification, as

was the case in *Griffin Indus. v. Green*, 280 Ga. App. at 860 (1), and the other cases cited above.

2. Accordingly, we will consider Roland's assertion that the trial court erred in finding that individualized issues precluded class certification.

"Before claims can be certified for class adjudication under Rule 23 (b) (3), the plaintiff must show, among other things, that there are questions of law and fact common to the class members which predominate over any individual questions." (Citation and punctuation omitted.) *Rollins, Inc. v. Warren*, 288 Ga. App. 184, 186 (1) (653 SE2d 794) (2007).

> Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23 (b) (3).

(Citation and footnote omitted.) Id. Thus, we must analyze the elements of Roland's breach of contract and breach of warranty claims to determine whether the class members are similarly situated as contemplated by Rule 23. *Carnett's, Inc. v. Hammond*, 279 Ga. at 127 (3).

A claim for breach of contract requires that a plaintiff show the breach of a contract and damages. *Budget Rent-a-Car of Atlanta v. Webb*, 220 Ga. App. 278, 279 (1) (469 SE2d 712) (1996). Roland argues that Ford breached the class members' contracts by charging them "for a non-existing upgraded radiator" in violation of the contract for the purchase of the option packages. Roland asserts that each member of the putative class shared the same contract because each purchased a Ford F-150 with a window sticker showing that they had purchased either the towing or cooling packages. He argues that whether each purchaser heard different representations or negotiated different terms is irrelevant "in determining whether the terms of the window sticker became part of the contract or what the objective meaning of those window sticker terms is." In other words, Roland argues that commonality and predominance are established simply by the fact that the window sticker on each truck in the class showed the purchase of an optional package for a price.

We disagree. In order to establish that a contract exists under Georgia law, "the plaintiff in a breach of contract action has the

burden of proving three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." (Citation and punctuation omitted.) *Cline v. Lee*, 260 Ga. App. 164, 168 (1) (581 SE2d 558) (2003). Roland cannot meet this burden as to the window sticker because he cannot establish mutual assent to its terms by each class member. Although the sticker reflects a suggested MSRP for the optional packages, whether a buyer agreed to pay that price, or any price, for the package would require a case-by-case evaluation.[4] The window sticker generally is just the starting point for further negotiations between the buyer and the dealer as to price, packages and other terms, leading eventually to a final, individual purchase agreement.[5] Thus, there is no common contract based upon the terms of the window sticker to which each member of the class was a party.

In fact, Roland's own purchase experience demonstrates the individualized nature of the purchasing process. While Roland did not rely upon any representations regarding the towing package in purchasing his truck, the evidence shows that he did negotiate a reduction in the purchase price based, at least in part, upon an incentive provided by his employer. The MSRP on Roland's car, as reflected in the bill of sale, was $31,285, which presumably was the MSRP listed on the window sticker. Roland clearly did not agree to this price, as the ultimate cash price charged was much less. In particular, the bill of sale reflects that the $350 list price for the towing package was reduced at some point to $298. Roland's purchase agreement, which indicates that it represents "the entire agreement[6] affecting this purchase," does not reflect a separate charge for the towing package, but reflects a price on the vehicle as a whole in an amount that does not correspond to the prices reflected on the bill of sale. Thus, the exact price Roland paid for the towing package is unclear. The other putative class members presumably negotiated varying prices for their own option packages, and some may even have negotiated to receive a package at no additional cost.

The price paid for the option package is relevant to the issue of whether Ford breached a contract by charging for a radiator upgrade

---

[4] In any event, the window stickers in the record, at least, do not provide that these optional packages would include an upgraded radiator. Rather, that specification was found only in internal Ford documentation.

[5] Moreover, we note that Roland entered into his purchase agreement with the Warner Robins dealership, and not with Ford. An issue exists as to whether Ford would be bound by that contract or any of the other class members' contracts. But we will assume, for purposes of analysis only, that Ford is bound by such contracts.

[6] We note that the purchase agreement specifically incorporates the terms of one window form, the Buyer's Guide, for the purchase of used cars. No similar incorporation of the window sticker is made for the purchase of a new car.

that was not furnished. Although the option packages were priced as a whole, and not by their component parts, some value must be assigned to the portion of the package the purchasers actually received. The towing package, for example, presumably included other equipment and features to facilitate the truck's towing capacity. In fact, after Ford removed the specification for an upgraded radiator in connection with that package, it continued to market it for the same price. Accordingly, if a purchaser bought the towing package at a reduced price as Roland did, an individual fact issue arises as to whether the purchaser actually paid for an upgraded radiator he did not receive and thus whether a breach occurred.

Under these circumstances, class action treatment is inappropriate.

> [E]ven if [the] members of [the] class seek to enforce the same contractual right and to obtain the same relief against a defendant, the predominance requirement is not met when the *answer* to the question of whether the defendant breached its contractual obligations will require a highly individualized, case-by-case determination as to each putative class member.

(Emphasis in original.) *Rollins, Inc. v. Warren*, 288 Ga. App. 187, 188 (1). See also *Carnett's, Inc. v. Hammond*, 279 Ga. at 129 (4); *Life Ins. Co. of Ga. v. Meeks*, 274 Ga. App. at 217 (3) (a); *Winfrey v. Southwest Community Hosp.*, 184 Ga. App. 383 (1) (361 SE2d 522) (1987).

Similarly, individual issues exist in connection with the claims for breach of warranty. For example, Georgia law imposes two requirements for establishing a claim of breach of a written warranty: "(1) notice of the defect and (2) a reasonable opportunity to repair the defect." (Citations omitted.) *Knight v. American Suzuki Motor Corp.*, 272 Ga. App. 319, 321-322 (1) (612 SE2d 546) (2005).

The Limited Written Warranty that came with the F-150 does not contain any specific representation regarding the cooling system or the radiator. Although the bumper-to-bumper warranty covers "defects in factory-supplied materials or workmanship," an issue would arise as to whether the standard radiator could be considered a defect under the warranty, and that may require a case-by-case determination as to whether it affected the truck's performance. Moreover, the class members would have to establish that they met their own obligations under the warranty, including proper maintenance, in order to recover for any purported breach.

In addition, individual issues would arise as to whether each class member gave Ford a reasonable opportunity to repair the defect. For example, a significant portion of the proposed class had

recourse under Ford's Customer Satisfaction Program, and an issue would exist as to whether they opted to accept Ford's offer to replace the radiator or instead chose one of the other two options. Class members, such as Roland, who were not subject to the program would not elude this individual fact question because they also had an obligation to provide an opportunity for repair. Roland, in fact, did not provide Ford an opportunity to replace the radiator.

Fact questions also exist as to the claim of breach of an implied warranty of merchantability. See *Mitchell v. BBB Svcs. Co.*, 261 Ga. App. 240, 242 (582 SE2d 470) (2003) (stating elements for claim). Assuming arguendo that the failure to install an upgraded radiator was a defect under the implied warranty, individual issues would arise as to whether injury was caused by such a defect. The court would have to conduct individual inquiries as to whether the standard radiator affected the truck's performance in order to establish that the class member was injured by the purported defect.

Accordingly, we agree with the trial court that individual fact issues would predominate over any common issues the class might share, and we conclude that the trial court did not abuse its discretion in determining that class certification was precluded on that ground.[7] Although the individual questions we have noted differ in some respects from those cited by the trial court, "a correct decision of a trial court will not be reversed regardless of the reasons given therefor." (Citations and punctuation omitted.) *Duffy v. Landings Assn.*, 254 Ga. App. at 509 (1).

3. Given our holding in Division 2, we need not address Roland's remaining arguments as to the other factors addressed in the trial court's order. See *Duffy v. Landings Assn.*, 254 Ga. App. at 509 (1).

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 29, 2007 — ■

*Morriss, Lober & Dobson, William G. Dobson, Charles M. Cork III*, for appellant.

---

[7] We note that courts in other jurisdictions have reached conflicting conclusions as to whether similar claims are subject to class certification. E.g., compare *Zeno v. Ford Motor Co.*, 238 FRD 173 (W.D. Pa. 2006) (granting motion to certify) and *Ford Motor Co. v. Ocanas*, 138 SW3d 447 (Tex. Ct. App. 2004) (reversing grant of class certification). The decision whether to certify a class depends in large part upon the description of the class, the claims raised and the evidence and arguments presented in support of class certification. Accordingly, we consider this case based upon the record before us and are not persuaded by the reasoning in *Zeno*, upon which Roland attempts to rely.

*McKenna, Long & Aldridge, Charles K. Reed, Jonathan R. Friedman*, for appellee.