## A08A0743, A08A0744. SMITH et al. v. MORRIS, MANNING & MARTIN, LLP et al.; and vice versa.
(666 SE2d 683)

ADAMS, Judge.

This is the third appearance of this matter before this Court. The case arises out of a suit filed by David Smith and Premier/Georgia Management Co., Inc. ("Premier") against Morris, Manning & Martin, LLP ("MMM"), John G. "Sonny" Morris, Jeanna A. Brannon, Elizabeth Gray Tatum and Tim Pollack (collectively "the law firm").

---

As an initial matter, we note that neither the appellants nor the appellees in these matters complied with Court of Appeals Rule 25 (c) (2) (iii), which requires that references to the record should be indicated by specific volume or part of the record and by page number. None of the briefs provides volume numbers for its record citations. Moreover, in many instances the page citations given by the parties did not support the factual assertions in the briefs, and in other instances no record citations were provided at all. We take this opportunity yet again to "remind counsel that it is not the job of the Court of Appeals to cull the record on behalf of a party, and that a lack of proper citations greatly hinders our consideration of the issues on appeal." (Footnote omitted.) *Latimore v. City of Atlanta*, 289 Ga. App. 85, 86 (1) (656 SE2d 222) (2008). The lack of proper citations is especially egregious in a case such as this, with a 27-volume record involving complex business transactions.

### Factual Background

This matter arose out of extended negotiations involving a real estate development project in the Buckhead area of Atlanta, in which Smith and his solely owned company Premier planned to develop a luxury apartment complex (the "Project").[1] The owners of all but one of the parcels comprising Phase 1 of the Project entered into sales contracts with Daltex Realty Services, Inc. ("Daltex"), while one of Smith's other companies owned the remaining parcel. Premier subsequently entered into a Purchase and Sale Agreement with Daltex to purchase the Phase 1 parcels not affiliated with Smith (the "Daltex Agreement"). To obtain financing for the Project and other developments, Smith negotiated a personal $350,000 loan (the "Loan") from Howe D. Whitman and Whitman, Whitman & Merkle, Inc. ("WWM") in October 1995.

Both Smith and Whitman and their various affiliated companies were MMM clients. MMM partner Robert E. Saudek was in charge of Whitman's representation, while partner Frank Bazzel was the primary lawyer overseeing Smith's representation.[2] Consequently, MMM prepared a written conflict letter for the parties to sign (sometimes "original conflict letter"). That letter provided that MMM would be representing only Whitman, and not Smith, in connection with the loan transactions and other transactions relating to the Project, although the law firm would continue to represent

---

[1] Further factual background in this matter may be found in *Premier/Ga. Mgmt. Co. v. Realty Mgmt. Corp.*, 272 Ga. App. 780, 781 (3) (613 SE2d 112) (2005), and *Schoenbaum Ltd. Co. v. Lenox Pines, LLC*, 262 Ga. App. 457 (585 SE2d 643) (2003).

[2] Neither Saudek nor Bazzel was named as a defendant in the lawsuit.

both Smith and Whitman in other matters. The letter further stated that should litigation arise between the two, MMM could not represent either. Both Smith and Whitman executed this letter in their individual capacities under language providing that "[t]he terms of this letter are acknowledged and agreed to this 27th day of October, 1995."

Among the documents signed in connection with the Loan was a "Pledge Agreement, Collateral Assignment and Security Agreement" (the "Pledge Agreement"), which Tatum assisted Saudek in drafting and preparing. Under the terms of that agreement, Premier pledged and assigned to WWM its rights and interests in a limited liability corporation ("LLC") and a limited partnership ("LP") as collateral for the Loan (collectively the "collateral"). Any distributions or fees payable to Premier or Smith in connection with this collateral would be paid to WWM during the pendency of the Loan, but would be credited to the outstanding Loan balance. Smith signed the Pledge Agreement on behalf of Premier. And although Smith asserts that Whitman failed to sign that document, the record contains a copy of the Pledge Agreement signed by Whitman on behalf of WWM, as well as a copy of that document without WWM's signature.[3]

Premier also signed an "Assignment of Limited Partnership and Limited Liability Company Interests" (the "Assignment"), assigning its interest in the same collateral to WWM outright. Under a separate "Agreement to Reconvey," WWM agreed to reconvey the interest in the collateral back to Premier if Smith repaid the Loan by January 30, 1996. The promissory note Smith signed in connection with the Loan also reflected January 30, 1996 as the original maturity date.

Smith did not repay the Loan by this date, and the parties executed a "First Modification to Promissory Note" dated February 8, 2006, which extended the maturity date to April 8, 1996 and which evidenced an additional $500,000 loan from WWM. Other Loan documents were also modified to reflect these changes, including the Agreement to Reconvey and the Pledge Agreement. In March 1996, the maturity date on the Loan was again extended to April 30, 1996.

In May 1996, however, the parties once again agreed to modify the terms of the Loan, and executed a "Memorandum of Agreement" ("MOA") in that regard. Under the MOA, the Loan's maturity date was extended to July 18, 1996. The MOA further contemplated that WWM would enter into a venture for the development of the Project

---

[3] To the extent that the document was not signed at the closing, Tatum testified that the failure to obtain the signature would have been a mistake.

with George Lane on or before June 15, 1996 and that Phase 1 of the Project would close by July 14. If the venture was successfully formed, Smith would receive a portion of the venture's profits on Phase 2 of the Project, as well as reimbursement of a number of expenses Smith incurred on both Phase 1 and Phase 2. But if the venture was not successfully formed and Phase 1 did not close by the agreed upon dates, WWM would reassign the Phase 1 contracts to Smith upon payment by Smith of $32,500.

On or about July 1, when the venture between Whitman and Lane had not been formed by the deadline, Smith began negotiating with Raymond Schoenbaum on a separate deal to develop the Project, providing him with a pro forma outlining a proposed deal. Smith contends that on July 8, he and Schoenbaum agreed that Smith was to receive a 35 percent equity interest in the project in accordance with his proposal, but the only supporting documentation he cites is the unsigned pro forma. Schoenbaum denied that he entered into an agreement with Smith based on the pro forma or that he ever agreed to give Smith a 35 percent equity interest.

On July 15, after the deadlines for both the venture and the closing passed, Smith presented MMM with a check for $32,500 and a written request that the properties be reassigned to him under the terms of the MOA. Tatum faxed a copy of the check to Whitman. Whitman did not accept this check, however, and instead requested a cashier's check. Although Smith faxed Whitman a copy of a cashier's check on July 22, it does not appear that Whitman ever took possession of or accepted the cashier's check.

Smith testified that he told MMM attorneys Tatum and Brannon on or around July 15 that he intended to enter into a separate agreement with Schoenbaum instead. Although Smith and Premier assert on appeal that the two lawyers agreed that MMM would "help [Smith and Premier] to close the Project with Schoenbaum," the record citation provided does not support this statement. Instead, the cited testimony reflects only that he *asked* them "if they would help me close." In response they indicated that they would have to ask Whitman, and we could find no evidence that Whitman ever consented to such representation. Nevertheless, Smith averred in a later affidavit that MMM attorney Brannon promised him on July 17 that the firm would "cooperate" with him in closing his deal with Schoenbaum. Based upon this, he asserts that he believed that MMM was acting as his attorney in this regard.

In the meantime, however, Whitman and Lane were proceeding with their venture for developing the Project, which was registered with the Secretary of State under the name Canterbury Square, LLC ("Canterbury"). MMM represented Whitman in connection with this venture. And as the firm continued to represent Smith, Whit-

man and Lane with regard to other matters, it prepared a second conflict letter, dated July 12, 1996 (the "second conflict letter"). That letter specifically provided that, although MMM continued representing Smith and Lane in other matters, it was not representing them or their affiliated companies in connection with the Canterbury venture or in connection with a tax-deferred exchange in the Project property. The letter also noted that individual defendants Pollack, Brannon and Tatum each had represented Smith, Whitman and/or Lane and their affiliated entities in various capacities, and that all three lawyers would be representing Whitman and his affiliated companies in connection with Canterbury. Smith and the other two men signed this letter individually and on behalf of their affiliated companies. Smith testified, however, that he did not sign the second conflict letter until July 17.

At some point previously, Daltex had assigned to WWM its interest in the Phase 1 properties covered by the Daltex Agreement. WWM decided to exercise its right to close on those properties, and called all the Phase 1 property owners, including Smith, to MMM's office on July 17 for the closing. At the same time, however, Smith was attempting to get extensions on the sales contracts for the Phase 1 properties to facilitate his separate deal with Schoenbaum. Thus, Smith would not agree to close on the sale of the Phase 1 property he controlled.[4]

In addition, a dispute arose that day concerning the Phase 2 properties. Daltex owned the rights to purchase seven of those properties, and it appears that Premier had contracted with Daltex for an assignment of the rights to those properties. But on July 15, Tatum had phoned Daltex and obtained an assignment in favor of Canterbury of the same properties. Tatum testified that she made the call at Smith's instructions, but he denied this. He said he became aware of the assignment only later in a telephone call with the president of Daltex. Following that conversation, Daltex sent a letter dated July 16, terminating the assignment to Canterbury. This contributed to a breakdown in negotiations between Smith, Whitman and Lane on July 17.

Because Smith, Whitman and Lane could not resolve their differences, they agreed that the sales on the Phase 1 properties would be closed in escrow. Smith testified that he acquiesced in the escrow closings in case his separate deal with Schoenbaum did not pan out. Although Smith and Whitman continued to negotiate, they were never able to resolve their differences.

---

[4] Smith was represented by independent counsel during the July 17 negotiations with Whitman and Lane.

Smith testified that on July 18, he was in the office of Schoenbaum's attorney, Craig Kritzer, when Kritzer took a call from Brannon on the speaker phone. Smith asserts that Brannon disparaged his character to Kritzer, asserting that Daltex was merely Smith's alter ego, and that Smith interposed Daltex into the Project in order to cheat investors such as Schoenbaum by inflating the cost of the required land. In addition, Brannon said that Smith had similarly attempted to cheat Whitman. She represented that Canterbury actually held Daltex's assignment of the rights in the Project's properties and suggested that Whitman would facilitate Schoenbaum's development of the Project in exchange for the payment of a fee.[5]

After the phone call between Kritzer and Brannon, Schoenbaum and Smith negotiated a deal memorialized as a "Business Resolution Agreement" dated July 19 (the "BRA"). Under this agreement, Smith accepted a ten percent profit participation interest in the Project, and received no equity interest. Schoenbaum stated that was the only deal he ever offered Smith. He further averred that no actions or statements by MMM or any of the individual lawyers influenced his decision to offer Smith this deal and not the deal outlined in the pro forma.

Smith testified that on July 24, he paid MMM $7,000 for legal work in connection with the Schoenbaum deal. He recalled that he was seeking MMM's help in obtaining extensions on the contracts for the Project's real property, which were due to expire and which he had agreed to deliver to Schoenbaum under the BRA. Smith said that although MMM accepted the payment, no extensions were ever obtained and the contracts expired. Smith contends this rendered him unable to meet his obligations under the BRA, and thus Schoenbaum was able to close on the properties without Smith's participation.

Smith and Schoenbaum subsequently entered into a renegotiated agreement on September 13, 2006, under which Schoenbaum agreed to pay Lenox Pines, LLC, one of Smith's affiliated companies, the ten percent participation interest, and Smith was to enter into an agreement to serve as the developer of the Project. Smith served for

---

[5] Smith and Premier also presented a transcript of a July 22 telephone conversation purporting to be between Brannon and Schoenbaum, but because the transcript was not properly authenticated, it cannot be considered in connection with the summary judgment motion. See *Khoury Constr. Co. v. Earhart*, 191 Ga. App. 562 (382 SE2d 392) (1989); *Steve M. Solomon, Jr., Inc. v. Edgar*, 92 Ga. App. 207 (88 SE2d 167) (1955) (setting out proper standards for authentication). Nor can Smith and Premier rely upon Brannon's deposition from other litigation. See footnote 10, infra. In contrast, Smith's affidavit concerning the July 18 call was admissible. See generally *Sudduth v. Young*, 260 Ga. App. 56, 59 (1) (579 SE2d 7) (2003); OCGA §§ 24-3-3, 24-3-31, 24-3-33.

a time as developer on the project, but was terminated from that position on December 13, 1996. Schoenbaum stated that Smith was compensated for his services as a developer. Smith and Lenox Pines subsequently brought suit against Schoenbaum and others in connection with the Project. See *Schoenbaum Ltd. Co. v. Lenox Pines, LLC*, 262 Ga. App. 457 (585 SE2d 643) (2003). The suit was eventually settled when Smith and Lenox Pines accepted payment of $5,036,612.65 in exchange for a release.[6]

### Procedural Background

The original complaint filed by Smith and Premier asserted claims for legal malpractice, slander, libel, tortious interference, breach of fiduciary duty and breach of contract. The trial court dismissed this complaint for failure to comply with the expert affidavit requirement in OCGA § 9-11-9.1. In *Smith v. Morris, Manning & Martin, LLP*, 254 Ga. App. 355, 359 (3) (562 SE2d 725) (2002) ("*Smith I*"), this Court affirmed the dismissal of the malpractice claims, but reversed the dismissal of the remaining claims after assuming, without deciding, that those claims alleged something other than professional negligence. Id. at 359 (4).

After the case was remanded, Smith and Premier amended the complaint to assert claims for intentional breach of contract, intentional breach of fiduciary duty and fraud, while dismissing the claims for slander, libel and tortious interference. The law firm moved for judgment on the pleadings on the ground that the remaining claims sounded in professional negligence, and therefore were barred by Smith's and Premier's failure to timely file an expert affidavit. The law firm also asserted that Smith could not properly amend the original complaint. The trial court found that Smith's and Premier's amendment was proper, but granted the motion for judgment on the pleadings. Both sides appealed.

In *Smith v. Morris, Manning & Martin, LLP*, 264 Ga. App. 24 (589 SE2d 840) (2003) ("*Smith II*"), this Court affirmed the trial court's finding that the amendment was proper, but reversed the grant of judgment on the pleadings. The Court held that because the amended claims of intentional breach of contract, intentional breach of fiduciary duty and fraud alleged intentional wrongdoing, the requirements of OCGA § 9-11-9.1 did not apply. Id. at 27.

---

[6] Several other lawsuits arose out of this matter. WWM sued Premier and Smith on August 1, 1996 claiming ownership of the LLC and LP originally pledged as collateral. Smith paid $125,000 and assigned his rights in the LLC and distributions under the LP to WWM to settle this suit. On September 26, Canterbury sued Daltex, Schoenbaum and Smith to enforce its rights under the July 15 Daltex assignment. That matter was settled on November 29, 1996, by all parties except Smith.

Following the second remand in this case, Smith and Premier amended their complaint several times, with the final amendment alleging claims for intentional breach of contract (Count 1), intentional breach of fiduciary duty (Count 2), fraud (Count 3), simple negligence (Count 4), tortious interference with contracts (Counts 5 and 7), tortious interference with business relations (Count 6) and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 8). The complaint also sought punitive damages (Count 9) and expenses of litigation (Count 10). The law firm moved for summary judgment on all claims.

The trial court granted summary judgment to the law firm on the claims of simple negligence, tortious interference with contract, tortious interference with business relations and RICO and all damages claimed thereunder (Counts 4, 5, 6, 7 and 8). The trial court denied summary judgment to MMM on the claims for breach of contract, breach of fiduciary duty, fraud, punitive damages and litigation expenses (Counts 1, 2, 3, 9 and 10). Nevertheless, the trial court found that certain of the damages asserted by Smith on these claims were too speculative and remote as a matter of law, and thus granted summary judgment on those damage claims. Finally, the trial court found that the claims set forth in Counts 1, 2 and 3 were premised upon Smith's and Premier's contractually based attorney-client relationship with MMM, and granted summary judgment to the individual lawyers as to all claims of the complaint. The trial court further ruled that the law firm would not have to produce its financial information unless and until a jury rendered a verdict entitling Smith and Premier to punitive damages.

In Case No. A08A0743, Smith and Premier appeal the grant of summary judgment to the individual defendants, and the partial grant of summary judgment to MMM, including the court's decision delaying production of the law firm's financial information. In addition, Smith and Premier appeal the trial court's denial of a Motion to Add John P. McNaughton as a Party Defendant and a motion for contempt. In Case No. A08A0744, MMM cross-appeals the denial of its motion for summary judgment as to Counts 1, 2, 3, 9 and 10 of the complaint.

We review de novo the trial court's orders on the law firm's motion for summary judgment, construing the evidence, as well as all reasonable conclusions and inferences drawn from it, in the light most favorable to Smith and Premier, as nonmovants. *Walker v. Sears Roebuck & Co.*, 278 Ga. App. 677 (629 SE2d 561) (2006). Nevertheless, "[i]f a defendant who does not bear the burden of proof at trial demonstrates that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case, the burden shifts to the nonmoving party to point out specific

evidence giving rise to a triable issue." (Footnote omitted.) *Norby v. Heritage Bank*, 284 Ga. App. 360, 361 (644 SE2d 185) (2007).

### Case No. A08A0743

1. As a threshold matter, we will address Smith's and Premier's contention that the conflict letters were not enforceable.

(a) Premier asserts that it was not bound by either conflict letter because Smith did not sign them on the company's behalf. Neither conflict letter expressly references Premier or contains a formalistic signature by Smith signing on Premier's behalf as its president. Nevertheless the reference line of the original conflict letter indicates that it relates to the Loan transaction between Smith and his affiliates and Whitman and his affiliates. The second conflict letter is signed by Smith on behalf of himself and his affiliated companies. It is undisputed that Premier was one of those companies. Smith testified in his deposition that he was the company's president and sole shareholder. Accordingly, we find that Smith executed the second conflict letter on behalf of Premier.

And pretermitting the issue of whether Premier is also bound by the original conflict letter, we find the language of each conflict letter put Smith on notice of the potential conflicts and informed him that MMM was representing only Whitman, and not Smith or Premier, in connection with the covered transactions.[7] This notice is directly imputable to Premier as Smith signed the letters while acting in connection with Premier's business, as well as his own. See OCGA § 10-6-58. See generally *Crosby v. Savannah Elec. &c. Co.*, 114 Ga. App. 193, 206 (150 SE2d 563) (1966). Accordingly, whether or not Premier was a party to the original conflict letter, the company was charged with knowledge of the conflict of interest and MMM's role in the transactions. Therefore, Premier could not reasonably have relied upon MMM to represent its interests in connection with the matters addressed by the conflict letters.

(b) Additionally, we find no merit to Smith's and Premier's contention that the conflict letters did not apply to the individual MMM lawyers. Although the letters did not specifically name every individual MMM lawyer who may potentially have performed legal work covered by the letters,[8] MMM could only perform such work through its attorneys. Smith and Premier do not contend that any of the individual attorneys acted outside the scope of their employment

---

[7] Smith testified on the first day of his deposition that he understood that MMM would be representing Whitman in connection with the Loan transaction, and that he would be unrepresented.

[8] We note, however, that the second conflict letter specifically mentioned three of the named defendants, Pollack, Tatum and Brannon.

YALE LAW LIBRARY

with the firm in connection with the covered matters. Thus, Smith's and Premier's knowledge that MMM was not representing them equated to knowledge that the individual MMM attorneys also were not representing them in connection with the covered transactions, and any waiver in the conflict letters also applied to the individual attorneys.

(c) Smith and Premier further assert that the original conflict letter did not apply to any actions taken by MMM and its attorneys prior to October 27, 1995 when the letter was signed. Saudek, in contrast, testified that on October 12, 2005, both Smith and Whitman asked MMM to represent Whitman only in connection with the Loan. We agree with the trial court that this presents an issue of fact as to whether Smith and Premier were aware that MMM and its attorneys were not representing their interests in the Loan prior to the execution of the original conflict letter. MMM was certainly acting as their counsel with regard to other matters.

(d) Smith and Premier further argue that MMM violated the terms of the letters by conferring with Whitman's and Canterbury's attorneys in litigation filed against Smith. The original conflict letter specifically states that if litigation arose between Smith and Whitman, MMM could not represent either party. Although MMM apparently did not represent Whitman or Canterbury as counsel of record in any such litigation, there is some evidence indicating that the firm may have participated in such representation. For example, a letter dated September 6, 1996 reflects that Canterbury's counsel solicited attorney Morris's input in drafting the complaint against Smith, and MMM produced from their files a copy of that complaint with handwritten changes. We agree with the trial court that a jury question remains on this issue.

2. Smith and Premier assert that the trial court erred in granting the individual defendants summary judgment on all claims. We hold in Division 9, below, that certain jury issues exist precluding summary judgment against MMM as to the breach of contract, breach of fiduciary duty and fraud claims. They urge that they have presented evidence to show individual liability under these claims, citing several acts of claimed wrongdoing by these lawyers.

We agree with the trial court, however, that the breach of contract arises out of Smith and Premier's legal representation by the firm, and that the alleged acts of wrongdoing by the individual defendants occurred within the scope of that representation. Accordingly, we find that no jury issue exists as to individual liability under the breach of contract claim.

Similarly, we find that Smith and Premier have failed to raise a jury issue that the individual lawyers breached a fiduciary duty to them. They allege that individual liability arises from Tatum's

actions in drafting Loan documents, by her silence indicating that MMM would be assisting Smith in his Schoenbaum dealings, and in obtaining the assignment from Daltex. But we find that Smith and Premier have failed to present evidence that Tatum, individually, was acting as their attorney at the time of these alleged acts. Their individual claims against the other attorneys fail for similar reasons.

And, with one exception, we agree with the trial court that Smith and Premier failed to present sufficient evidence to create a jury issue as to whether the individual lawyers committed fraud.[9] We find, however, that they have presented evidence to raise an individual claim of fraud against Brannon. Smith testified that Brannon represented that MMM would cooperate with him in connection with the Schoenbaum deal. But the evidence shows that Brannon may have acted in contravention to that representation in her July 18 telephone call with Kritzer, when she was unaware that Smith was listening. Accordingly, we reverse the grant of summary judgment to Brannon on the fraud claim.

3. Smith and Premier also assert that the trial court erred in denying their claims for tortious interference with contracts and business relations. They assert various actions by the law firm tortiously interfered with Premier's contract with Daltex for rights in the Phase 2 properties (Count 5), with Smith's and Schoenbaum's business relations, notably the alleged July 8 agreement based upon the pro forma (Count 6), and with the BRA between Smith and Schoenbaum (Count 7).

> The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citation omitted.) *Dalton Diversified v. AmSouth Bank*, 270 Ga. App. 203, 208-209 (4) (a) (605 SE2d 892) (2004). Accordingly, Smith

---

[9] Further, we find that Smith and Premier have failed to present evidence to support their claim of conspiracy among the individual defendants. Although as nonmovants they are "entitled to all reasonable inferences from the evidence presented, such inferences cannot be based upon mere conjecture or possibility." (Citation omitted.) *Norman v. Jones Lang LaSalle Americas*, 277 Ga. App. 621, 625 (1) (627 SE2d 382) (2006).

and Premier must "show that damage to [their] rights or obligations under a contract proximately resulted from the third party's alleged interference." *Carter v. Willowrun Condo. Assn.*, 179 Ga. App. 257, 259 (4) (345 SE2d 924) (1986). "And, any damage claimed to have been suffered by a plaintiff does not proximately result from the defendants' alleged misconduct, if the damage would have occurred notwithstanding their misconduct." (Citations omitted.) *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832 (1) (662 SE2d 880) (2008).

We find that Smith and Premier cannot establish that the law firm's alleged actions interfered with their business relationship with Schoenbaum because they cannot establish that these actions influenced Schoenbaum's decisions in negotiating with Smith, leading him to offer Smith a ten percent profit participation, rather than the figure referenced in the pro forma. Schoenbaum asserted that none of the law firm's actions or representations affected his decisions in such negotiations, and Smith and Premier have offered no admissible evidence to the contrary.[10] Accordingly, the claim for tortious interference with business relations under Count 6 fails as a matter of law because Smith and Premier cannot establish the requisite causation.

It follows then that Smith and Premier also cannot prove their claim under Count 5 of the complaint for tortious interference with contract. Although they allege an interference with Premier's contract with Daltex for the Phase 2 properties, the damage they claim is the loss of a $402,000 markup on the sale of those properties. They assert that this figure represents the markup they lost after Schoenbaum did not enter into the July 8 contract with Smith (the "Markup"). But Smith and Premier will not be able to demonstrate that the alleged loss of the Markup would not have occurred in any event, without any alleged interference by the law firm with the Daltex contract. Accordingly, they cannot establish the requisite causation to establish this claim.

But we reverse the trial court's grant of summary judgment on the claim of interference with the BRA between Smith and Schoen-

---

[10] Although Smith and Premier attempt to rely upon Schoenbaum's deposition and affidavit testimony from other litigation, such evidence is inadmissible because the named defendants in this case were not party to those lawsuits. See *Troy v. Interfinancial*, 171 Ga. App. 763, 769-770 (4) (320 SE2d 872) (1984). See also *Pope v. Fields*, 273 Ga. 6, 8 (1) (a) (536 SE2d 740) (2000) (outlining requirements for using such a deposition). In any event, neither Schoenbaum's deposition testimony nor the affidavit support Smith's and Premier's position. Schoenbaum testified that he agreed to go forward in negotiations with Smith using the pro forma only as a guideline, but he never formally agreed to its terms. In Schoenbaum's affidavit, he averred that Smith proposed that he receive a thirty-five percent interest and due to Schoenbaum's inexperience, he relied upon his attorney's advice before offering Smith a ten percent profit participation interest, which Smith accepted. Similarly, the other depositions cited by Smith and Premier from other litigation are inadmissible here. Id.

baum under Count 7. Smith asserts that the law firm's actions interfered with his ability to obtain the necessary extensions to meet his obligations under the BRA, resulting in his loss of any rights in the Project property. Although we have held that Smith cannot prove causation as to the loss of the Markup, he also asserts a damage claim for the expenses he incurred in attempting to obtain the extensions as well as damages for any difference in his compensation under the BRA and his re-negotiated deal with Schoenbaum. While we emphasize that Smith must demonstrate that any such loss of compensation under the BRA was caused by the alleged interference and not by other factors, we find that issues of fact remain precluding summary judgment on this claim.

4. Smith and Premier also argue that the trial court erred in holding that they lacked standing to assert a RICO claim and further failed to establish a pattern of racketeering activity as required for that claim.

Under OCGA § 16-14-4 (a), "[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." "Georgia defines a pattern of racketeering activity as engaging in at least two interrelated acts that have the same or similar intents, results, accomplices, victims, or methods of commission indictable under certain categories of state or federal law." *Markowitz v. Wieland*, 243 Ga. App. 151, 154 (2) (532 SE2d 705) (2000). Smith and Premier alleged in their complaint that the law firm committed eight crimes constituting predicate acts. By the time of the appeal, the number of asserted acts of wrongdoing supporting the RICO claim had grown to 20. But we could find no instance in the record where Smith and Premier argued to the trial court that these 12 additional assertions of wrongdoing constituted predicate acts under their RICO claim. And it is well settled that this Court "do[es] not consider arguments neither raised nor ruled on by the court below and that are asserted for the first time on appeal." (Punctuation and footnote omitted.) *Thomas v. Peachtree Orthopaedic Clinic*, 290 Ga. App. 869, 873 (660 SE2d 758) (2008). Accordingly, we will confine our review to the eight original predicate acts considered by the trial court.

Smith and Premier contend that the trial court erred in finding that they did not have standing to assert the RICO claims. "A private RICO plaintiff must show a direct nexus between at least one of the predicate acts listed under the RICO Act and the injury it purportedly sustained. To establish this nexus, the plaintiff must show that one of the predicate acts directly harmed *it*, not a third party."

(Punctuation and footnote omitted.) *Schoenbaum Ltd. Co. v. Lenox Pines*, 262 Ga. App. at 470 (8) (c).

The alleged predicate acts arise in connection with Tatum's actions in obtaining the July 15 assignment of rights to the Phase 2 properties from Daltex to Canterbury, and subsequent actions taken by the law firm to enforce that assignment. Smith and Premier allege that these actions constituted theft by deception, various instances of wire fraud and theft by taking.

But even if Smith and Premier can establish they were the intended targets of one or all of these predicate acts, we find that their RICO claim fails because they cannot establish that any of these acts resulted in their claimed damages. In order to survive summary judgment, Smith and Premier were required to show that their injury flowed directly from the predicate acts targeted at them, "not merely that [their] injury was an eventual consequence of the [acts] or that [they] would not have been injured but for the [acts]." *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 806 (1) (500 SE2d 591) (1998). Smith and Premier assert that as a result of the predicate acts, Schoenbaum refused to enter into the alleged July 8 contract with Smith, and once again claim they are entitled to the $402,000 Markup. We have previously found based upon the record before us that Smith and Premier cannot establish that the law firm's actions proximately caused this alleged loss. "Thus, the trial court properly granted the defendants' motion for summary judgment because [Smith and Premier] lacked standing in that there is no evidence to support proximate causation, an essential element of [their] RICO claim." Id. at 806 (1).[11]

5. Smith and Premier further contend that the trial court erred in dismissing their claim of simple negligence against MMM partner Morris, arising out of a June 4, 1996 interoffice memorandum that Morris sent to Bazzel, Saudek, Pollack and Tatum asking for information and inquiring as to the status of the deals pending among Smith, Whitman and Lane. Smith and Premier assert that Morris recognized that a conflict existed between the interests of Smith and other MMM clients, yet failed to follow up and clarify the issue, breaching a duty to Smith and Premier who were still clients of MMM in June 1996.

Although Smith and Premier label this claim as one for simple negligence, asserting that Morris failed to exercise ordinary care in following through on his inquiry, the complaint's characterization of

---

[11] "A grant of summary judgment must be affirmed if right for any reason, whether stated or unstated. It is the grant itself that is to be reviewed for error, and not the analysis employed." (Citation and punctuation omitted.) *Gilbert v. City of Jackson*, 287 Ga. App. 326, 327 (1) (651 SE2d 461) (2007).

the claim does not control. *Health Mgmt. Assocs. v. Bazemore*, 286 Ga. App. 285, 287 (648 SE2d 749) (2007). We find that the claim asserted against Morris is one of professional negligence as its resolution will inescapably involve questions of professional standards, judgment and responsibility with regard to MMM's representation of its clients. For instance, the memorandum makes no reference to any potential conflict of interest, and the threshold issue to be addressed is whether Morris's knowledge of the client's overlapping transactions should have alerted him to potential conflicts of interest. Such a question directly implicates professional standards and Morris's professional judgment. See Rule 1.7 of the Georgia Rules of Professional Conduct.

As this Court held in *Smith I* that all claims of professional malpractice were barred due to the failure to file an expert affidavit, the trial court properly granted summary judgment on this claim.

6. On April 27, 2007, Smith and Premier moved to add MMM partner John P. McNaughton as a party defendant to the action. The trial court denied the motion, and Smith and Premier assert error. We review the denial of such a motion for abuse of discretion. *Ellison v. Hill*, 288 Ga. App. 415, 418 (654 SE2d 158) (2007).

The motion was filed after MMM produced a fax sent by McNaughton to an attorney at Glass, McCullough & Sherrill ("GMS"), who was representing MMM's other clients in lawsuits filed against Smith. The fax attached a copy of a memorandum from Tatum to Morris, providing a chronology of her actions in connection with the assignment of the Phase 2 contracts from Daltex to WWM. The chronology outlined Tatum's conversations with a number of people involved in the negotiations surrounding the Project, including Smith. Smith and Premier contend the fax was an intentional violation of the attorney-client privilege.

"Parties may be dropped or added by order of the trial court or of its own initiative at any stage of the action and upon such terms as are just. OCGA § 9-11-21." *Little Tree, Inc. v. Fields*, 240 Ga. App. 12, 13 (1) (b) (522 SE2d 509) (1999). But under the circumstances of this case, the addition of another party was authorized under OCGA § 9-11-15 (c) only if Smith and Premier could show that:

> (1) the amended claim against the new defendant arises out of the same facts as the original complaint; (2) the new defendant had sufficient notice of the action; and (3) the new defendant knew, or should have known, that but for a mistake concerning his identity as a proper party, the action would have been brought against him.

(Citation omitted.) Id. at 13 (1) (b).

The trial court could have found that Smith and Premier failed to meet the third requirement of demonstrating that McNaughton knew or should have known that, but for a mistake in identity, he would have been named as an individual defendant in the lawsuit. Smith and Premier do not assert, for example, that McNaughton ever personally represented them or any other Smith-related entities. Accordingly, any attorney-client privilege implicated in the fax would be that between Smith and MMM, and not between Smith and McNaughton individually. We find no abuse of discretion in the trial court's denial of the motion. See generally *Steed v. Wellington Healthcare Svcs.*, 285 Ga. App. 446, 448 (2) (646 SE2d 517) (2007).

7. On April 20, 2007, Smith and Premier filed a Motion for Contempt and Sanctions asserting that the defendants had not complied with the trial court's discovery orders. The trial court denied the motion in its entirety.

> A trial court has wide discretion in determining whether its orders have been violated and such determination will not be disturbed absent a gross abuse of discretion. If there is any evidence in the record to support a trial judge's determination that a party either has or has not wilfully disobeyed the trial court's order, the decision of the trial court will be affirmed on appeal.

(Footnote omitted.) *Rice v. Lost Mountain Homeowners Assn.*, 288 Ga. App. 714, 715 (1) (a) (655 SE2d 214) (2007). In addition, "[t]rial courts have broad discretion to control discovery, including the imposition of sanctions. Absent the showing of a clear abuse of discretion, a court's exercise of that broad discretion will not be reversed." (Punctuation and footnote omitted.) *ASAP Healthcare Network v. Southwest Hosp. &c.*, 270 Ga. App. 76, 77 (1) (606 SE2d 98) (2004).

Having reviewed the arguments and the record before us, we cannot say that the trial court abused its discretion in denying the motion for contempt and sanctions.

8. Smith and Premier further take issue with the trial court's order delaying production of MMM's financial documents until after the issue of punitive damages is resolved by a jury.

A plaintiff is "not entitled to discover information concerning . . . personal financial resources absent an evidentiary showing (by affidavit, discovery responses, or otherwise) that a factual basis existed for [the] punitive damage claim." *Holman v. Burgess*, 199 Ga. App. 61, 64 (404 SE2d 144) (1991). And because in Division 11, below, we uphold the trial court's determination that jury issues remain as to the claim for punitive damages, we find that the trial

court abused its discretion in denying production of any of the law firm's financial records until after the jury renders its verdict.

Nevertheless, even "where pre-trial discovery of the defendant's financial resources is authorized, the scope of such should be restricted to the extent necessary to prevent an unreasonable intrusion into the defendant's privacy." *Holman v. Burgess*, 199 Ga. App. at 63-64. See also *Ledee v. Devoe*, 225 Ga. App. 620, 625 (2) (484 SE2d 344) (1997). The parties do not argue and we specifically do not address whether the production of the documentation requested in this case should be restricted or limited in any manner.

## Case No. A08A0744

9. MMM appeals the portion of the trial court's order denying its motion for summary judgment as to the claims for intentional breach of contract, intentional breach of fiduciary duty and fraud,[12] asserting that no issue of fact exists regarding those claims. But we agree with the trial court that issues of fact remain, including:

(a) An issue of fact exists as to whether MMM accepted a payment of $7,000 to assist Smith in obtaining extensions of the contracts Smith needed to perform under the BRA without intending to provide such services. Smith's assertions that he paid that amount, and that Brannon indicated that MMM would cooperate with him in seeking those extensions are sufficient to raise a jury question on this issue. Issues of fact also arise from the evidence, including the July 18 telephone call between Brannon and Kritzer and correspondence between Morris and Canterbury's lawyers, as to whether MMM may have, instead, worked against Smith's interests in that regard, resulting in damages as discussed in Division 3, above.

(b) We previously held that an issue of fact exists as to MMM's representation of the parties prior to the original conflict letter. During that period, MMM drafted the Loan documents and drafted the Pledge Agreement, Assignment and Agreement to Reconvey at Whitman's direction. Although the Loan did not close until October 27, Smith testified that he signed many of the documents the day before, thus binding himself to their terms and did not see the conflict letter before that date.[13] Further, an issue exists as to whether or when Whitman signed the Pledge Agreement on WWM's

---

[12] See *Roland v. Ford Motor Co.*, 288 Ga. App. 625, 629-630 (655 SE2d 259) (2007) (elements of breach of contract); *Ansley Marine Constr. v. Swanberg*, 290 Ga. App. 388, 391 (1) (660 SE2d 6) (2008) (elements of breach of fiduciary duty claim); *Markowitz v. Wieland*, 243 Ga. App. at 153 (1) (elements of fraud).

[13] MMM contends that this statement contradicted Smith's earlier deposition testimony that he knew the law firm was representing Whitman in connection with the Loan. But we find

behalf. Jury questions exist, therefore, as to whether the MMM intended the Assignment and Agreement to Reconvey to favor Whitman over Premier at a time when they had an attorney-client relationship with Smith and Premier in connection with the same transaction and whether this ultimately contributed to Premier's loss of the LLC and distributions under the LP.

(c) In addition, we find that an issue of fact exists as to whether MMM used information gleaned from its attorney-client relationship with Smith and Premier to assist other clients. An issue exists, for example, as to whether MMM actively was working to prevent Smith from meeting his obligations under the BRA, which ultimately necessitated that he renegotiate his deal with Schoenbaum and whether that resulted in the damages discussed in Division 3, above.

(d) Similarly, we previously found in Division 1 (d), above, that an issue of fact exists as to whether MMM intentionally assisted in the representation of its other clients in actions against Smith and Premier, and we further find that issues of fact exist as to whether their actions were an intentional violation of the conflict letters, and whether these actions resulted in damage to Smith and Premier.

10. Nevertheless, the trial court found that certain damages sought by Smith and Premier under these claims are too remote and speculative, and we agree. As discussed in Division 3, above, we found that they will be unable to establish that MMM's actions caused any losses arising out of the purported July 8 agreement, including the Markup. Similarly, we agree that their claims for attorney fees incurred in the litigation against Schoenbaum, and the loss of professional reputation arising from Schoenbaum's termination of him as developer on the Project are also too remote to be recoverable. But the complaint alleges other damages including those as discussed above and those as to which the trial court specifically denied summary judgment, and we find that these damage claims survive the motion for summary judgment.

11. MMM further asserts that the trial court erred in denying its motion for summary judgment as to punitive damages.

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

---

no direct conflict, as Smith's first deposition did not address when he learned that MMM was representing Whitman.

OCGA § 51-12-5.1 (b). We find that the evidence of record in this case precludes summary judgment on the punitive damage claims. See generally *Brookview Holdings v. Suarez*, 285 Ga. App. 90, 98 (4) (645 SE2d 559) (2007).

*Judgment affirmed in part and reversed in part in Case No. A08A0743. Judgment affirmed in Case No. A08A0744. Mikell, J., concurs. Smith, P. J., concurs in judgment only.*

DECIDED JULY 16, 2008 —
RECONSIDERATION DENIED JULY 31, 2008 — 

*Graydon W. Florence, Jr.*, for appellants.
*King & Croft, F. Carlton King, Jr., Seyfarth Shaw, John A. Sherrill, Eric F. Barton*, for appellees.