**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**May 6, 2025**

# In the Court of Appeals of Georgia

A25A0182. KEARNEY et al v. OPPENHEIMER & COMPANY, INC. et al.

A25A0195. WRIGHT et al. v. OPPENHEIMER & COMPANY, INC. et al.

DILLARD, Presiding Judge.

In the two cases underlying these consolidated appeals, John Kearny and Lisa Wright separately—along with many other plaintiffs—sued Oppenheimer & Company, Inc., Ann Greene, and Gordon Morse[1] for violating Georgia's Racketeer Influenced and Corrupt Organizations Act ("RICO"), conspiracy to violate RICO, and negligence per se. The appellants in both cases[2] appeal the trial court's orders

---

[1] Except when Greene or Morse are referenced individually, they and Oppenheimer & Company, Inc., will be referred to collectively as "Oppenheimer."

[2] The appellants in Case No. A25A0182 are Georgia residents (collectively, the "Kearny appellants") and those in Case No. A250195 are North Carolina residents

granting Oppenheimer's motions to dismiss their complaints for failure to state a claim. They argue the trial court erred by (1) applying an incorrect standard in determining their complaints did not adequately plead the element of proximate cause as to their RICO claims; (2) concluding that regulations enacted by the Georgia Securities Commissioner could not be the basis for a claim of negligence per se; and (3) ruling that the Wright appellants—all North Carolina citizens—could not sue Oppenheimer under Georgia's RICO statute. For the following reasons, we affirm in both cases.[3]

---

(collectively, the "Wright appellants"). Because the lawsuits are the same in all material respects, they were placed on a "parallel track" before the same judge, but not consolidated into a single case. The trial court issued separate, but substantially similar, orders on the same day dismissing the complaints. When referencing both cases, the Wright and Kearny appellants will be collectively referred to as "the appellants."

[3] Oral argument was held in these consolidated appeals on December 3, 2024, and is archived. *See* Court of Appeals of the State of Georgia, Oral Argument, Case Nos. A25A0182, A25A0195 (Dec. 3, 2024), available at https://vimeo.com/1036761617.

Viewed *de novo* in the light most favorable to the appellants,[4] the complaints alleged the following.[5] Oppenheimer is a New York corporation that describes itself as "a leading global full-service brokerage and investment bank." And at all relevant times, Oppenheimer engaged in business as a broker-dealer under OCGA § 10-5-30[6] and maintained an office in Atlanta. From 2012 until 2016, Morse was Oppenheimer's Atlanta branch manager, and he supervised John Woods, one of the salesmen. During the same period, Greene was Oppenheimer's "branch administrative manager" in its Atlanta office, and she was also responsible for supervising Woods, as well as other employees.

---

[4] *See, e.g.*, *Campbell v. Cirrus Educ., Inc.*, 355 Ga. App. 637, 638 (845 SE2d 384) (2020) ("[O]n appeal, this Court conducts a de novo review of a trial court's ruling on a motion to dismiss. In doing so, our role is to determine whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, and with all doubts resolved in the plaintiff's favor, disclose with certainty that the plaintiff would not be entitled to relief under any state of provable facts . . . .").

[5] The facts alleged in both complaints are identical in all material respects. For the sake of clarity and ease of reference, the factual background described in this opinion is gleaned from the complaint filed in Case No. A25A0195.

[6] *See* OCGA § 10-5-30 (a) ("It is unlawful for a person to transact business in this state as a broker-dealer unless the person is registered under this chapter as a broker-dealer or is exempt from registration as a broker-dealer under subsection (b) or (d) of this Code section.").

Given its status as a broker-dealer, Oppenheimer was required to file an accurate and truthful Uniform Termination Notice for Securities Industry Regulations ("U-5 Form"), which reports the termination of a salesman and the reasons for his or her firing.[7] Oppenheimer also had a continuing obligation to amend and update its initial U-5 Form filing to note, *inter alia*, internal investigations or civil litigation involving investment-related statutes that took place while Morse, Greene, Woods, and others were associated with the company. Indeed, the U-5 Form is often the first indication that the Georgia Securities Commission ("GSC") receives regarding potential misconduct by members of the securities industry. And GSC rules also imposed on Oppenheimer, Morse, and Greene the duty to "exercise diligent supervision over activities of its agents and associated persons." Indeed, under GSC rules, Oppenheimer, Morse, and Greene were required to supervise Woods's

---

[7] *See* Ga. Comp. R. & Regs. 590-4-5-.03 (3) ("No broker-dealer or issuer shall employ any agent who is not registered as required by the Act, and each such broker-dealer or issuer shall promptly notify the Commissioner of its termination of such agent's employment. The registration of such agent shall automatically be terminated from the time of termination of employment. Said notification may be accomplished by filing the necessary documents with the CRD. If the agent is not registered with the CRD, notification shall be accomplished by filing a Uniform Termination Notice for Securities Industry Registration (U-5 Form) with the Commissioner.").

activities to ensure they did not violate securities law, as well as to "approve all outside investment and securities business activities of each [Oppenheimer] agent prior to the agent engaging in such activities"

In September 2008, Oppenheimer's office of legal counsel in New York was served with a subpoena issued in a civil proceeding then pending in Fulton County, Georgia, styled *Lisa Walsh et al. v. John Woods et al.* At that point, Woods had not informed Oppenheimer about this lawsuit, which violated the company's rules, as well as securities-industry rules. In that case, the plaintiffs alleged they met with Woods at Oppenheimer's Atlanta office to discuss possible investment opportunities, and Woods fraudulently induced them to collectively invest $964,000 in unapproved, illicit programs by promising a 12 percent return on their investments.

Regardless of its ultimate disposition, the *Walsh* lawsuit provided Oppenheimer with "actual notice" that Woods (1) had been sued in an investment-related case; (2) was engaged in multiple undisclosed and unapproved outside business activities in violation of securities laws and regulations; (3) failed to notify Oppenheimer of the lawsuit; and (4) engaged in private securities transactions (those not approved by Oppenheimer) in violation of securities laws and regulations. And as of the time those

lawsuits were initiated, Oppenheimer still had not disclosed to securities regulators that Woods—its registered agent—was named as a defendant in the *Walsh* lawsuit.

Sometime in 2008, while working as a broker in good standing at Oppenheimer (despite its knowledge of the *Walsh* lawsuit), Woods founded Horizon Private Equity, III, LLC ("Horizon") and began marketing it to Oppenheimer customers, as well as the investing public. But Horizon never registered the securities it issued with the Securities and Exchange Commission ("SEC") or in compliance with certain state laws. Indeed, from 2008 until 2021, Woods—and other salespeople that he recruited—solicited hundreds of investors (primarily senior citizens and retirees) to invest in Horizon. And during that time, Woods and others committed securities fraud by making misrepresentations to Horizon investors. Woods falsely told investors that their investments in Horizon were guaranteed, they would be paid a fixed rate of interest, and they could redeem their investment at any time with notice.

In furtherance of his scheme, Woods concealed from investors that a portion of their investments would be distributed as "dividends" to earlier investors, rather than actually being invested. Woods also did not disclose to investors that he and other salespeople would be paid a commission from the sale of the securities. Indeed,

according to the appellants, between 2008 and 2021, Woods and others committed countless acts of mail and wire fraud by mailing investor documents and information, wiring investor money to Horizon, redeeming investments via wire transfer, and paying monthly dividends via wire transfer. Then, in 2023, Woods pleaded guilty to wire fraud committed as part of his Horizon investment scheme.

As to Oppenheimer's participation in Woods's Horizon scheme, he presented potential investors with his Oppenheimer business card and "traded heavily" on the "prestigious Oppenheimer name" to promote Horizon. Woods also invited prospective investors to meet him at Oppenheimer's Atlanta office to "pitch" Horizon to them. In doing so, Woods described Horizon as an Oppenheimer-approved or sponsored product. And once their accounts were opened with Oppenheimer, Horizon investors wired money to those accounts, and Oppenheimer compliance personnel needed to review and approve each transfer.

Upon receiving investor funds, Oppenheimer transferred them to an external bank account owned by Horizon. But at some point, doing so became increasingly burdensome and expensive for Horizon. To address this issue, Oppenheimer permitted Horizon to open a brokerage account, which it named the "Horizon

dividend account." Woods then opened Oppenheimer accounts for each of Horizon's investors; and as with the dividend account, either Morse or Greene was required to approve them before they could be opened. In fact, one of them needed to review the accounts and alert Oppenheimer's compliance department of any "red flags."

From 2012 to 2016, once Horizon and the investors' accounts were approved, the funds necessary to keep Horizon's scheme going were being obtained by Oppenheimer personnel under Morse or Greene's supervision. Meanwhile, Oppenheimer directly profited from Horizon each month by charging substantial fees, and Woods was listed as the "financial advisor" for the Horizon accounts. Also, from 2012 until 2016, Oppenheimer allowed Woods to burden Horizon investor accounts with substantial margin loans, which required Horizon to pay interest to Oppenheimer. Indeed, while Woods used the Horizon accounts to generate large commissions for Oppenheimer and himself, Horizon investors sustained millions of dollars in losses. Eventually, Woods's excessive trading and the massive losses in Horizon investor accounts alerted Oppenheimer's compliance and surveillance department of the issue, but no one took steps to stop Woods.

In early 2011, the SEC conducted an on-site audit of Oppenheimer's Atlanta office. During the audit, the SEC relied on Oppenheimer and its personnel to provide honest, complete, and accurate information in response to its questions, and the SEC specifically asked about the excessive trading in the Horizon accounts. In response, Oppenheimer's compliance team falsely represented to the SEC, via email, that Horizon was a "private hedge fund" run by an investment professional. But in reality, Woods was an Oppenheimer financial advisor, and he was running Horizon in that capacity. And by 2014, Woods's trading in the Horizon accounts had raised multiple red flags. So, to ensure the trading could continue, Horizon's account forms were altered to inflate its assets from $3 million to $135 million. Morse and Greene were required to approve this change, which they did. Yet, Morse and Greene never took any action to confirm the accuracy of this massive adjustment.

In November 2014, Oppenheimer's compliance department raised concerns about the Horizon dividend account with Albert Lowenthal, Oppenheimer's CEO. And at some point, Morse and Lowenthal demanded that Woods provide them with Horizon's private placement memorandum ("PPM") and financial statements. Lowenthal's review of the documentation Woods provided raised immediate

concerns, including that the unaudited financial statement was only a single page and the PPM did not look like any he had seen in his decades of working in the securities industry.

Then, to "ensure Horizon was no longer associated with Oppenheimer," Lowenthal ordered that all of its customers who invested in Horizon transfer their accounts to a different firm no later than January 15, 2015. But neither Greene, Morse, Lowenthal, nor any other Oppenheimer employee alerted securities regulators or Horizon's 174 investors of potential issues with their investments. On December 11, 2015, after learning more about Horizon's reckless trading, Oppenheimer's compliance department again alerted Morse and Greene about the issue. But to ensure that Horizon could continue trading, Morse falsely stated that its "portfolio of investments is a few hundred million dollars," even though the financial statements Woods provided a year earlier reflected a significantly lower amount.

In early 2016, Greene and Morse became aware of a lawsuit filed against Woods the previous year in a federal court in Nevada, styled *Himmler v. Livingston Group Asset Management, Inc.* The *Himmler* complaint named Horizon as a defendant, and the plaintiffs' fraud claims related to Woods's personal involvement with the

company. And at the time the appellants filed their complaints in the Nevada case, Oppenheimer had yet to comply with Georgia's Uniform Securities Act of 2008 ("GUSA") by failing to disclose that Woods—its registered agent—was a named defendant in the lawsuit.

In March 2016, the president of Oppenheimer's Wealth Management Division traveled to its Atlanta office and met with Woods and Morse. This visit coincided with Oppenheimer publicly announcing a regulatory "house cleaning," which was designed to terminate brokers and branch managers who had compliance problems. Around the same time, Oppenheimer notified Woods and Morse that they must resign their positions by June 30, 2016, and Morse did so. But the complexity of transferring Woods's accounts out of Oppenheimer required him to remain in his position past that date. And according to the appellants, Oppenheimer actively concealed Woods's illegal investment scheme from regulators and the investing public by allowing him to "quietly resign" in December 2016.

*A25A0182 - The Kearny Lawsuit*

On June 6, 2023, the Kearny appellants—who all invested in Horizon at various times between *2017* and 2021 —filed a complaint against Oppenheimer, Greene, and

Morse, asserting that they were victims of a Ponzi scheme (Horizon)[8] orchestrated by Woods.[9] In doing so, they asserted claims for violations of RICO, conspiracy to violate RICO, and negligence per se. Oppenheimer and Morse filed separate answers to the complaint, as well as motions to dismiss for failure to state a claim. And later, Greene also answered the complaint and filed a "notice of joinder," adopting and incorporating Oppenheimer and Morse's motions to dismiss. Following responsive pleadings by the parties, the trial court granted Oppenheimer and Morse's motions to dismiss in a detailed order; and in light of her joinder, the court dismissed all claims against Greene.

*A25A0195 - The Wright Lawsuit*

On July 13, 2023, the Wright appellants—who all invested in Horizon at various times between *2017* and 2021—filed a complaint against the same defendants in the

---

[8] According to the SEC, "[a] Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors. Ponzi[-]scheme organizers often promise to invest your money and generate high returns with little or no risk. But in many Ponzi schemes, the fraudsters do not invest the money. Instead, they use it to pay those who invested earlier and may keep some for themselves." https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme (last visited on May 5, 2025).

[9] It is undisputed that none of the appellants in either of these cases invested in Horizon before Woods resigned from Oppenheimer in 2016.

Superior Court of Fulton County, Georgia, which was substantially similar to the one filed by the Kearny appellants—and which also asserted claims for violations of RICO, conspiracy to violate RICO, and negligence per se. And as in the Kearny case, Oppenheimer and Morse filed separate answers to the complaint and motions to dismiss. Following responsive pleadings by the parties, the trial court granted Oppenheimer and Morse's motions in a detailed order; and in light of her joinder, the court dismissed all claims against Greene. These consolidated appeals follow the trial court's simultaneous dismissal of the complaints in both cases.

We review *de novo* the trial court's ruling on a motion to dismiss, "accepting as true all well-[pleaded] material allegations in the complaint and resolving any doubts in favor of the plaintiff."[10] But we are under no obligation to "adopt a party's legal conclusions based on these facts."[11] And importantly, a motion to dismiss for failure to state a claim upon which relief may be granted

> should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief

---

[10] *Parnell v. Sherman & Hemstreet, Inc.*, 364 Ga. App. 205, 213-14 (3) (b) (874 SE2d 394) (2022) (punctuation omitted).

[11] *Id.* at 214 (3) (b) (punctuation omitted).

under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.[12]

With these guiding principles in mind, we turn now to the appellants' claims of error, which are identical (for the most part) in both cases.

1. The appellants first argue the trial court erred by failing to apply the correct standard in determining that they had not adequately pleaded the proximate-cause element of their RICO claim. We disagree.

The Georgia RICO Act was enacted by the Georgia General Assembly to "impose criminal penalties against those engaged in an interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic or physical threat or injury, and civil remedies to compensate those injured by reason of such acts."[13] Indeed, under OCGA § 16-14-4 (a), "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire

---

[12] *Id.* (punctuation omitted); *see* OCGA § 9-11-12 (b) (6).

[13] *Overlook Gardens Props., LLC v. Orix, USA, LP*, 366 Ga. App. 820, 834 (1) (c) (884 SE2d 433) (2023) (punctuation omitted); *accord Hansford v. Veal*, 369 Ga. App. 641, 648 (1) (b) (894 SE2d 215) (2023).

or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." In this regard, "racketeering activity," also known as a "predicate act," is the "commission of, the attempt to commit, or the solicitation or coercing of another to commit, a 'crime which is chargeable by indictment' under one of forty categories of offenses."[14]

So, to establish a valid civil RICO claim, a plaintiff "must show that the defendant violated or conspired to violate Georgia's RICO Act and that the RICO violation proximately caused injury to the plaintiff."[15] And satisfying the proximate-cause element of the RICO Act requires a plaintiff to "show that his injury flowed

---

[14] *Wylie v. Denton*, 323 Ga. App. 161, 164 (1) (746 SE2d 689) (2013)(punctuation omitted). Although *Wylie* was originally physical precedent because then Chief Judge Phipps concurred solely in the judgment without further commentary, it has since been favorably relied on in cases that constitute fully binding precedents. *See Johnson v. Butler*, 323 Ga. App. 743, 746 n.13 (748 SE2d 111) (2013) (explaining that subsequent unanimous panels may adopt, and thus make fully precedential, the holdings from physical-precedent opinions). So, because this Court has repeatedly cited *Wylie* as precedential, we do so as well. *See, e.g.*, *McArthur v. Beech Haven Baptist Church of Athens*, 368 Ga. App. 525, 533 (3) n.42 (890 SE2d 427) (2023); *Najarian Cap., LLC v. Clark*, 357 Ga. App. 685, 694 (4) n.32 (849 SE2d 262) (2020); *Z-Space, Inc. v. Dantanna's CNN Ctr., LLC*, 349 Ga. App. 248, 254 (2) (b) (825 SE2d 628) (2019).

[15] *Hansford*, 369 Ga. App. at 648 (1) (b) (punctuation omitted); *accord Overlook Gardens Props.,* 366 Ga. App. at 834 (1) (c).

*directly* from at least one of the predicate acts."[16] Significantly, this burden is not met where "a plaintiff shows merely that his injury was an *eventual consequence* of the predicate act or that he would not have been injured but for the predicate act."[17] Simply put, to survive a motion to dismiss, a plaintiff asserting a RICO claim "must allege more than that an act of racketeering occurred and that [he or she] was injured."[18] The plaintiff must show, then, that his or her injury was "the direct result of a predicate act *targeted* toward her, such that she was the *intended victim.*"[19]

---

[16] *Hansford*, 369 Ga. App. at 648 (1) (b) (emphasis supplied); *accord Overlook Gardens Props.,* 366 Ga. App. at 834 (1) (c); *see Gentry v. Volkswagen of Am., Inc.*, 238 Ga. App. 785, 791 (4) (521 SE2d 13) (1999) (explaining that, in determining proximate cause for purposes of a RICO claim, "[t]he question is whether the injury was directly caused by any RICO violation, not whether the injury was reasonably foreseeable").

[17] *Hansford*, 369 Ga. App. at 648 (1) (b) (punctuation omitted) (emphasis supplied); *accord Overlook Gardens Props.,* 366 Ga. App. at 834 (1) (c).

[18] *Wylie*, 323 Ga. App. at 164 (1); *see Cox v. Mayan Lagoon Ests., Ltd*, 319 Ga. App. 101, 109 (2) (b) (734 SE2d 883) (2012) ("[A] private plaintiff who wants to recover under civil RICO must show some injury flowing from one or more predicate acts. A plaintiff cannot allege merely that an act of racketeering occurred and that he lost money. He must show a causal connection between his injury and a predicate act. If no injury flowed from a particular predicate act, no recovery lies for the commission of that act." (punctuation omitted)).

[19] *Wylie*, 323 Ga. App. at 164 (1) (punctuation omitted) (emphasis supplied); *see Smith v. Morris, Manning & Martin, LLP*, 293 Ga. App. 153, 166 (4) (666 SE2d 683) (2008) (physical precedent only) ("In order to survive summary judgment, [the plaintiffs] were required to show that their injury flowed directly from the predicate

(a) *Direct RICO Claim*

While appellants contended below that Oppenheimer violated OCGA § 16-14-4 of Georgia's RICO Act in many ways and committed other offenses such as mail and wire fraud in connection with the Horizon scheme, they now limit the alleged predicate acts to violations of the Georgia Uniform Securities Act.[20] But these alleged violations all occurred *before* December 2016, at which point all Horizon-related accounts had been transferred out of Oppenheimer and Woods had already resigned.[21]

acts *targeted at them*, not merely that their injury was an eventual consequence of the acts or that they would not have been injured but for the [acts]." (punctuation omitted) (emphasis supplied)).

[20] *See* OCGA § 10-5-50 ("It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (1) To employ a device, scheme, or artifice to defraud; (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.").

[21] While appellants alleged that Oppenheimer engaged in securities violations between 2017 and 2021, including its failure to file or correct a false U-5 Form, those actions (at most) concealed information about Woods's misconduct and his resignation. To be sure, the appellants contend this post-2016 conduct was designed to "hid[e]" the Horizon scheme from the investing public and regulators. But as explained below, actions taken to cover up a third party's misconduct are insufficient, without more, to satisfy the proximate-cause element of a RICO claim. So, we do not address the post-2016 alleged violations separately.

Indeed, following the 2015 audit, Oppenheimer required the transfer of those accounts and "allowed" Woods to resign "to ensure Horizon was *no longer associated with Oppenheimer*."[22] Again, none of the appellants invested in Horizon before 2017; and when they did, they dealt only with Woods, who eventually pleaded guilty to wire fraud related to the Horizon scheme.

In dismissing the appellants' complaints, the trial court found they failed to allege that any RICO violations by Oppenheimer, Greene, or Morse were the proximate cause of their injuries. Even so, to support their RICO claims, the appellants provide a long list of actions and omissions by Oppenheimer that either somehow facilitated Woods's operation of the Horizon scheme between 2008 and 2016, concealed evidence of his fraudulent activities from investors between 2008 and 2021, or failed to comply with reporting requirements. But even if those actions affected *all* of the appellants' decisions to invest in Horizon (which is speculative at best), they cannot establish proximate cause merely by showing that "but for" this conduct, they would not have invested in Horizon.[23] Instead, as explained above, they

---

[22] (Emphasis supplied).

[23] *See supra* note 17 & accompanying text.

must "show that [their] injury was the direct result of a predicate act *targeted* toward [them], such that [they were] the *intended victim(s).*"[24] And because the appellants did not invest in Horizon until Oppenheimer was no longer affiliated with Woods or Horizon, it is unclear how they could have possibly been Oppenheimer's *intended* victims of any predicate acts alleged.

Indeed, in *McArthur v. Beech Haven Baptist Church of Athens*,[25] this Court similarly found that concealing certain predicate or criminal acts is insufficient to establish proximate cause for a RICO conspiracy claim. In that case, former boy scouts sued several churches, the Boy Scouts of America, and others, alleging that certain scoutmasters sexually abused them while serving at those churches at various times between 1950 and 1977.[26] The plaintiffs also alleged the churches were aware of the abuse but "concealed their actions, failed to protect the minor scouts, and failed to inform the public."[27] Finally, the plaintiffs alleged "a myriad of predicate acts

---

[24] *Wylie*, 323 Ga. App. at 164 (1) (punctuation omitted) (emphasis supplied); *see supra* note 19 & accompanying text.

[25] 368 Ga. App. 525.

[26] *See id.* at 525-26.

[27] *See id.* at 526.

19

allegedly committed in furtherance of the *coverup*, . . . including making false statements to public employees, influencing witnesses, and committing mail fraud, perjury, and theft."[28] Nevertheless, under these circumstances, the trial court granted the defendants' motion to dismiss the RICO claim, and we affirmed that judgment on appeal.[29] In doing so, we found that "[e]ven assuming that the plaintiffs could prove the facts alleged in their complaint, they failed to show the required causal connection between the predicate acts and their injuries."[30] In sum, the *McArthur* Court concluded that, "although the plaintiffs did allege that the churches joined the conspiracy with the Boy Scouts of America to cover up the abuse, the plaintiffs' injuries *did not directly flow from the coverup.*"[31] Similarly, in this case, the connection between Oppenheimer's failure to disclose Woods's conduct or merely allowing him to initially open Horizon accounts or use its resources is too attenuated to establish a direct nexus between those actions and the appellants' injuries.

---

[28] *Id.* at 533 (3) (emphasis supplied).

[29] *See id.* at 533-34 (3).

[30] *Id.* at 533 (3).

[31] *Id.* (emphasis supplied).

Similarly, in *Wylie v. Denton*,[32] which involved circumstances akin to those in this case, bank tellers terminated from their positions filed a RICO action against the bank and their direct supervisor.[33] Their complaint alleged that a bank employee had been embezzling money from a customer, and they were instructed to cash fraudulent checks.[34] Then, when the embezzlement was discovered, the bank refunded the embezzled money but failed to inform regulators that the bank management had ordered the tellers to do so.[35] Several months later, the tellers were fired.[36] And in their complaint, the tellers alleged the bank fired them to "cover up" the bank and its management's involvement in the embezzlement scheme.[37] The trial court denied the bank's motion to dismiss, and this Court reversed, finding that the tellers' injuries (*i.e.*, the loss of their jobs) was an indirect result of predicate acts directed at third

---

[32] 323 Ga. App. 161.

[33] *See id.* at 161.

[34] *See id.* at 163-64.

[35] *See id.* at 164.

[36] *See id.*

[37] *See id.*

21

parties.[38] So too here. The appellants' injuries are, at best, an indirect result or "eventual consequence" of Oppenheimer's alleged facilitation or coverup of Woods's criminal Ponzi scheme.[39]

Simply put, as to their RICO claim, the complaint alleged predicate acts and omissions committed by Oppenheimer that are far too attenuated to be the proximate cause of the financial losses incurred by individuals induced to invest in Horizon solely

---

[38] *See id.* at 168 (1).

[39] The appellants argue *Wylie* is distinguishable because none of the predicate acts (*i.e.*, forgery and theft directed at the bank's customer) were directed at the tellers, and they sought to recover for the loss of their jobs, which "was an indirect result of predicate acts directed at third parties." And they also claim that, in this case, they were the "direct victims" of the unlawful enterprise. We are unpersuaded. As in *Wylie*, the predicate acts alleged (allowing Woods to use Oppenheimer resources and covering up his scheme) were not *directed* specifically toward Horizon's potential *future* investors. Indeed, the alleged predicate acts identified in the appellants' consolidated brief include (1) *hiding* fraud-related lawsuits against Woods; (2) allowing Woods to use Oppenheimer's branch office as an "engine room" for his scheme; (3) allowing Woods to wire money from Horizon investors into Oppenheimer accounts; (4) creating Horizon's dividend account; (5) *concealing* Woods's fraudulent activity from investors; (6) misrepresenting Horizon's assets on account forms to keep Horizon's trading accounts from *being detected* by securities regulators; and (7) ignoring red flags raised by Horizon's trading accounts. But these are precisely the kind of actions that, at best, indirectly led to the eventual consequence of the appellants' financial choices and accompanying losses dealing only with Woods after 2016. *See infra* note 40.

*by Woods* after he resigned. As a result, the trial court did not err in dismissing their

RICO claim.[40]

(b) *Conspiracy to Violate Georgia's RICO statute.*

As mentioned above, the Georgia civil RICO statute "prohibits a person from

obtaining money or participating in an 'enterprise' through a 'pattern of racketeering

---

[40] *See McArthur*, 368 Ga. App. at 533 (3) (holding that sexual-abuse victims could not establish the proximate-cause element of their RICO claim when the alleged predicate act was the defendants concealing the abuse of a third party); *Wylie*, 323 Ga. App. at 168 (1) (holding that the plaintiffs could not establish the proximate-cause element of their RICO claim when they sought "to recover for their injuries (the loss of their jobs) that were the indirect result of [criminal] predicate acts directed at third parties"); *Nicholson v. Windham et al.*, 257 Ga. App. 429, 431 (1) (571 SE2d 466) (2002) (holding that the plaintiff could not establish the proximate-cause element of her RICO claim against a law firm and its employees when they solicited her participation in illegal activity and she was fired as a result of her refusal, not as a result of the alleged predicate act (*i.e.*, the solicitation)); *Gentry*, 238 Ga. App. at 792 (4) (holding that even though the plaintiff may not have suffered injuries but for the defendant's misrepresentations to a corporate entity, she failed to establish the proximate-cause element of her RICO claim when the defendant's misrepresentations were not directed at her); *Maddox v. S. Eng'g Co.*, 231 Ga. App. 802, 806 (1) (500 SE2d 591) (1998) (holding that plaintiff failed to satisfy the proximate-cause element of a RICO claim when, even if state agencies relied upon misrepresentations of the defendants, the depreciation in the plaintiff's property was nothing more than an eventual consequence of those misrepresentations); *see also Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 15, 17-18 (II) (B) (130 SCt 983, 175 LE2d 943) (2010) (holding, as to a RICO claim, that the plaintiff's injuries were not directly caused by defendant's alleged fraud when the plaintiff's "theory of liability rest[ed] on the independent actions of third and even fourth parties").

activity."[41] And the RICO statute also "prohibits a conspiracy to violate the statute."[42] Specifically, OCGA § 16-14-4 (c) provides:

> It shall be unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section. A person violates this subsection when: (1) He or she together with one or more persons conspires to violate any of the provisions of subsection (a) or (b) of this Code section and any one or more of such persons commits any overt act to effect the object of the conspiracy; or (2) He or she endeavors to violate any of the provisions of subsection (a) or (b) of this Code section and commits any overt act to effect the object of the endeavor.

Further, under Georgia law, a person "may be found liable for RICO conspiracy if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts."[43] So, as with a direct RICO claim, proximate cause is an essential element of a RICO conspiracy claim.[44]

---

[41] *McArthur*, 368 Ga. App. at 532 (3) (punctuation omitted).

[42] *Id.* at 533 (3) (punctuation omitted).

[43] *Id.* (punctuation omitted).

[44] *See Benevolent Lodge No. 3 v. Davis*, 365 Ga. App. 564, 569 (1) (878 SE2d 760) (2022) ("To establish a valid civil RICO claim, a plaintiff must show that the defendant violated *or conspired* to violate Georgia's RICO Act and that the RICO violation proximately caused injury to the plaintiff." (punctuation omitted) (emphasis

Here, the appellants contend the trial court "did no analysis whatsoever on [their] claim for conspiracy to violate Georgia RICO, instead insisting that it was not required to do so." This contention is belied by the record because the trial court's order expressly did so. Indeed, the court correctly concluded that proximate cause is also an essential element of a RICO conspiracy claim, and because it had already determined that they failed to allege the proximate-cause element of their RICO claim, this was fatal to the conspiracy claim as well.[45] Thus, when an alleged predicate act fails to establish a RICO claim, the conspiracy claim likewise fails.[46] And because we

_____

supplied)); *Five Star Athlete Mgmt., Inc. v. Davis*, 355 Ga. App. 774, 778 (2) (845 SE2d 754) (2020) (same)).

[45] *See Wylie*, 323 Ga. App. at 165-66 (1) ("Even assuming that the plaintiffs could prove the facts alleged in their complaint and that the alleged conduct constituted either a violation of the RICO statute *or a conspiracy* to violate that statute, they cannot establish the required causal connection between these predicate acts and their injuries." (emphasis supplied)); *Nicholson*, 257 Ga. App. at 430-31 (affirming the dismissal of RICO *and* RICO conspiracy claims when the plaintiff failed to establish she sustained a direct, as opposed to indirect, injury from the alleged predicate acts).

[46] *See Z-Space, Inc.,* 349 Ga. App. at 254 (2) (b) ("Because the fraudulent transfer [*i.e.*, predicate act], as alleged in the complaint, does not qualify as a racketeering activity under the Georgia RICO statute, even if the defendants conspired to commit acts of theft in furtherance of a fraudulent transfer, such a conspiracy would not violate the RICO statute."); *see also Wylie,* 323 Ga. App. at 165 ("Under Georgia law, a person may be found liable for RICO conspiracy if they knowingly and willfully join a conspiracy which *itself* contains a common plan or

have also concluded the appellants' RICO conspiracy claim fails for a lack of proximate cause, the trial court did not err in rejecting this claim on that basis.

2. Next, the appellants argue the trial court erred in determining that regulations enacted by the Georgia Securities Commissioner cannot be the basis of a claim for negligence per se. Once again, we disagree.

Generally speaking, negligence per se "arises when a statute or ordinance is violated."[47] And the violation of certain mandatory regulations may also amount to negligence per se if "the regulations impose a legal duty."[48] But negligence per se is not "liability per se."[49] So, even if negligence per se is shown, the plaintiff "must still prove proximate cause and actual damage in order to recover . . . ."[50]

---

purpose to commit two or more predicate acts." (punctuation omitted) (emphasis supplied)).

[47] *Mercy Hous. Ga. III, L.P. v. Kaapa*, 368 Ga. App. 270, 274 (1) (b) (888 SE2d 346) (2023) (punctuation omitted); *see Nash v. Reed*, 349 Ga. App. 381, 385 (3) (825 SE2d 853) (2019) ("Under Georgia law, a statute may establish a duty, and violating that statute may result in a breach of the duty, constituting negligence per se.").

[48] *Mercy Hous. Ga.*, 368 Ga. App. at 274 (1) (b) (punctuation omitted).

[49] *Nash*, 349 Ga. App. at 385 (3).

[50] *Id.* (punctuation omitted); *accord Hite v. Anderson*, 284 Ga. App. 156, 158 (643 SE2d 550) (2007).

Here, the appellants allege that Oppenheimer's violations of GUSA constituted negligence per se. In doing so, they contend Oppenheimer violated the statute by failing to "exercise diligent supervision over the activities of its agents and associated persons" and to "promptly and accurately report all broker-dealer and agent disciplinary data required by [GUSA] and the Rules on Central Registration Depository maintained by the Financial Industry Regulatory Authority, Inc." But we have already concluded in Division 1 *supra* that none of Oppenheimer's alleged actions or inactions with respect to the Horizon scheme and Woods's misconduct were the proximate cause of the appellants' financial injuries. As a result, their claim of negligence per se fails for the same reason.[51]

3. Finally, the Wright appellants contend the trial court erred in finding that they could not—as North Carolina residents—bring this lawsuit against Oppenheimer

---

[51] The trial court found the appellants' negligence per se claim failed because the statute and regulations they relied on did not provide for a private right of action, rather than addressing the proximate-cause requirement as it did with their RICO claims. But of course, "[t]his Court may affirm a trial court's grant of a motion to dismiss if it is right for any reason, so long as the argument was fairly presented to the court below." *Alred v. Ga. Pub. Def. Council*, 362 Ga. App. 465, 471 n.13 (869 SE2d 99) (2022). In this case, not only did the trial court address the issue of proximate cause at length as to the RICO claims, Oppenheimer expressly argued in both cases below that the negligence per se claim failed for the lack of proximate cause.

in Georgia. But because we have already determined the trial court did not err in dismissing their complaint, we need not address this argument.

For all these reasons, we affirm the trial court's dismissal of the complaints in both Case Nos. A25A0182 and A25A0195.

*Judgment affirmed in case Nos. A25A0182 and A25A0195. Mercier, C. J., and Land, J., concur.*